### SOUTHWEST NATURAL GAS CO. v. OKLAHOMA PORTLAND CEMENT CO.

No. 1772.

Circuit Court of Appeals, Tenth Circuit.

March 17, 1939.

Rehearing Denied April 25, 1939.

boiler plant, a power plant consisting of steam turbine and electric generators, and other essential accessories and appliances.

The Southwest Natural Gas Company[2] is the successor to the American Oil & Refining Company.[3] On April 2, 1926, the Refining Company entered into a contract with the Cement Company to supply for a term of 15 years the Cement Company's requirements of natural gas for operating its cement plant, including all "natural gas as may be needed or required by" the Cement Company "for fuel, heating, lighting, power purposes and such other purposes as may be necessary, proper or incidental to the operation of" its plant. The Gas Company succeeded to the Refining Company's rights under the contract.

On October 25, 1932, the Gas Company obtained a decree against the Cement Company in the United States District Court for the Eastern District of Oklahoma, in cause number 4347, enjoining the Cement Company from breaching the contract, from taking gas for the operation of its plant from any other person, firm, or corporation, and from using its own supply of gas for the operation of its plant except sufficient gas for the operation of one kiln. The exception in the decree was based on the fact that negotiations had taken place between the two companies in 1930, looking to the Cement Company obtaining an additional supply of gas in order to insure sufficient gas for the operation of the plant.

On July 15, 1933, the Gas Company and Cement Company entered into a supplemental contract making more definite and certain the rights of the respective parties under the decree in number 4347. This contract in part reads as follows:

"First: In respect of the right granted unto the Cement Company by the judgment and decree * * * in said cause No. 4347 * * * to use its own gas to operate one kiln at its Ada, Oklahoma plant, it is hereby stipulated that said Cement Company shall have the right under said judgment and decree to procure, from any source now or hereafter available to it, the gas necessary for the firing of one kiln, not to exceed in any event the amount hereinafter set forth.

"Second: The amount of gas required to fire one kiln is stipulated to be not more

Fred Simon and S. P. Cousin, both of Shreveport, La. (Scott Ferris, and John J. Hassler, both of Oklahoma City, Okl., and Yandell Boatner, and Pugh, Grimmet & Boatner, all of Shreveport, La., on the brief), for appellant.

J. B. Dudley, of Oklahoma City, Okl. (Dudley, Hyde, Duvall & Dudley, of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS and BRATTON, Circuit Judges, and VAUGHT, District Judge.

PHILLIPS, Circuit Judge.

The Oklahoma Portland Cement Company[1] owns and operates a cement manufacturing plant at Ada, Oklahoma. The plant consists of two mills, one known as Mill No. 1, a dry process mill, with four kilns, each 125 feet long, and one known as Mill No. 2, a wet process mill, with three kilns, each 240 feet long. Mill No. 2 has two and a half times the capacity of Mill No. 1. The plant also embraces a

[1] Hereinafter called the Cement Company.
[2] Hereinafter called the Gas Company.
[3] Hereinafter called the Refining Company.

than 3,000,000 cubic feet of gas for each twenty-four hours of kiln operation, calculated upon eight ounce pressure basis above absolute atmospheric pressure, assumed for the purpose of this agreement to be 14.4 pounds per square inch. Accordingly, on all days when the Cement Company operates one or more kilns, it shall have the right to use 3,000,000 cubic feet of its own gas. On days when no kiln is operated the 'Cement Company shall use none of its own gas. On days when one kiln only is operated and for a less period than twenty hours, the Cement Company shall be entitled to use its own gas to the extent of 125,000 cubic feet for each hour of actual operation of said kiln. On days when only one kiln is operated and for a period of more than twenty hours and less than twenty-four hours the Cement Company shall be entitled to use 3,000,000 cubic feet of its own gas as if for a full day."

When operated at full capacity the Cement Company's daily consumption of gas is from 15 to 16 million cubic feet. Since the fall of 1932 the Cement Company has not operated Mill No. 1 and has been able to supply its market demands by the operation of Mill No. 2 at approximately 30 per cent of its capacity. Its consumption of gas during that period has been approximately 5,300,000 cubic feet per day.

The original boiler plant of the Cement Company was installed in 1906. The plant was enlarged in 1918, by the purchase of three secondhand direct fired boilers. In the summer of 1933 the boilers in the plant became unsafe and it became necessary for the Cement Company to install a new boiler system. The Cement Company installed a combination waste heat and direct fired boiler system at a cost of $190,-000. This type of boiler system was first employed in cement plants in the United States in the year 1920. It is a modern, up-to-date and economical system similar to the boiler systems generally used in the cement manufacturing business in the United States. Like systems have been installed in two other plants of the Cement Company. In installing the new boiler system the Cement Company acted in good faith.

In the manufacture of cement, raw materials go into one end of the kiln and the gas fire is applied at the other end of the kiln. The fire produces a very high temperature. The inert product of the gas combustion reaches the upper end of the kiln at a high temperature. Under the old system this waste heat escaped through flues into the air. The old boiler system was located some distance from the kilns. The new boiler system was constructed near the kilns and this waste heat is conducted from the upper end of the kilns by a common flue into the boilers and a portion of it is utilized to heat the boilers. The boilers are also heated by direct gas fire, that is, by applying gas fire directly in the combustion chamber. The waste heat is not a new and independent fuel or a fuel equivalent. It is inert gas. It is not combustible and does not generate heat. It is simply a by-product of the cement manufacturing operation, having a high temperature which may be applied to heat the boilers. In heating the new boilers the Cement Company does not employ a new fuel; it simply utilizes the heat created by the combustion of the gas in the kilns to heat both the product in the kilns and also the boilers.

The contract for the new plant was let early in March, 1934, and the installation was completed approximately six months later.

On August 24, 1934, the Gas Company instituted this suit to enjoin the Cement Company from using the waste heat from its kilns to heat its boilers.

From July 15, 1933, to February 28, 1935, the average daily consumption of gas by the Cement Company in its boiler plant was approximately 2,300,000 cubic feet per day. As compared with the gas required to heat the old boiler plant, the new boiler plant when operated in conjunction with one kiln will reduce the gas consumption approximately 1,000,000 cubic feet per day and when operated in conjunction with two kilns will reduce the gas consumption approximately 1,900,000 cubic feet per day.

The trial court found the facts substantially as above stated. It held that the Gas Company was not entitled to an injunction restraining the use of the waste heat and entered its decree accordingly.

The Gas Company has appealed.

A requirement contract imposes upon the buyer the obligation to act in good

faith.[4] It does not prevent him from exercising judgment and discretion in the conduct of his business or from improving his plant so long as his conduct is bona fide.[5]

The term of the contract here involved was 15 years. That was longer than the ordinary life of certain of the appliances and equipment in the cement plant. It is a reasonable assumption that the parties contemplated whenever it became necessary to renew worn-out equipment, the Cement Company would install modern equipment in its place. Certainly, the parties did not contemplate that the contract should obligate the Cement Company to replace worn-out equipment with a like type of equipment that had become obsolete in the cement manufacturing industry, or not to utilize fully, modern equipment when installed. We are of the opinion that the Cement Company had the right to install modern equipment whenever it was necessary to replace worn-out equipment so long as in so doing it acted bona fide.[6]

The boiler plant of the Cement Company became worn out in 1933. To replace it the Cement Company installed a modern boiler system similar to the types generally used in other cement manufacturing plants. In the improved plant a new or different fuel was not substituted for gas, but a more efficient and economical utilization of gas was effected, so that the heat resulting from the combustion of the gas in the kilns was used both to heat the product in the kilns, and the boilers. Gas was employed to heat the boilers, although part of the heat was the result of direct fire and part was carried from the kilns to the boilers and applied indirectly. In so improving its plant, the Cement Company acted in good faith and in the exercise of prudent business judgment. This it had the right to do.

We conclude that the installation of the new boiler plant and the using of the waste heat in the kilns to heat the boilers did not constitute a violation of the contract.

The decree is accordingly affirmed.

---

[4] In re United Cigar Stores Co., 2 Cir., 72 F.2d 673, 675, certiorari denied Consolidated Dairy Products Co. v. Irving Trust Co., 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706; Brawley v. United States, 96 U.S. 168, 172, 24 L.Ed. 622; Williston on Sales, 2d Ed., Vol. 2, p. 1167.

[5] In Re United Cigar Stores Co., supra, the court said [72 F.2d 675]:

"There are many decisions to the effect that the obligation on the part of a buyer in a requirements contract to continue to have requirements without substantial variance is not to be implied more strictly than to impose upon him the obligation to act in good faith. He is bound to buy from the seller to the extent that he may have requirements when he is left free to deal with his business as he may deem best, provided his conduct is bona fide."

[6] American & British Mfg. Corp. v. New Idria Quicksilver Mining Co., 1 Cir., 293 F. 509, 530.