**OREGON PLYWOOD SALES CORPO- RATION, Appellant,**

v.

**SUTHERLIN PLYWOOD CORPORA- TION and Nordic Plywood, Inc., Appellees.**

**No. 15271.**

United States Court of Appeals Ninth Circuit.

July 24, 1957.

Koerner, Young, McColloch & Dezendorf, Herbert H. Anderson, and Charles H. Clarke, Portland, Or., for appellant.

King, Miller, Anderson, Nash & Yerke, Frederic A. Yerke, Jr., and Mark C. McClanahan, Portland, Or., George H. Luoma, Roseburg, Or., for appellees.

Before STEPHENS, Chief Judge, and CHAMBERS and BARNES, Circuit Judges.

STEPHENS, Chief Judge.

This is a diversity case dealing with an output contract. Appellant, Oregon Plywood Sales Corporation, purchases plywood from plywood manufacturers,

including its parent corporation, Oregon Plywood Corporation. Appellant's method of operation is to secure orders from its customers and then place its own orders with a manufacturer who ships the goods to the ultimate purchaser.

Appellee, Sutherlin Plywood Corporation, had completed construction of a "plywood lay-up mill" at Sutherlin, Oregon, in October, 1953, but lacked working capital when the mill was completed. Robert F. Hofheins, Vice-President, Treasurer and a Director of Oregon Plywood Corporation, and Secretary, Treasurer and a Director of appellant Oregon Plywood Sales Corporation, discussed with Sutherlin its problem of lack of working capital. As a result of such discussions, certain documents were exe-

cuted on December 17, 1953. The main document was a sales contract which provided in part as follows:

"In consideration of the benefits to be derived by each party hereto, Party of the First Part [Sutherlin Plywood] gives and grants unto Party of the Second Part [Oregon Plywood Sales Corporation] the right to purchase up to 80% of the output of Party of the First Part when Party of the First Part gets into production, and Party of the First Part agrees to accept up to 80% and ship Party of the Second Part's orders as specified and within a reasonable time."

Other pertinent paragraphs of the sales contract we cite in the margin.[1]

1. The paragraphs are not numbered in the contract, but we have numbered them for ease of reference.

Paragraph IV

"Party of the Second Part covenants to advance to Party of the First Part 80% of mill value on each car promptly upon receipt of invoice and original bill of lading, balance within ten days after arrival of car at destination, all less 2% cash discount. Value of veneer paid for by Party of the First Part in each car to be deducted from the payment."

Paragraph V

"Party of the First Part agrees as compensation for service by Party of the Second Part that an additional 5% of the Mill Value of product shall be retained by Party of the Second Part."

Paragraph VII

"Party of the Second Part covenants to use its best effort to maintain with Party of the First Part a thirty days' order file at the Mill."

Paragraph VIII

"It is agreed that there is a mortgage on the mill property of the Party of the First Part to Oregon Plywood Corporation, with certain monthly and annual payments to be made, but in the event Party of the Second Part shall not, at any time or times during the term of said mortgage, furnish sufficient orders to Party of the First Part which would enable Party of the First Part to dispose of 80% of the product of said mill, and for such reason said mill does not operate, then during such period or periods the payments stipulated to be made on said mortgage shall be deferred until Party of the Second Part shall have fur-

nished Party of the First Part orders which shall enable Party of the First Part to operate its mill continuously for the period of at least two weeks, whereupon the regular payments on the mortgage indebtedness shall resume, and the term of said mortgage shall be extended accordingly."

Paragraph IX

"Party of the First Part shall have the right to reject any orders placed with it by Party of the Second Part, provided specifications are not up to production conditions, nor if unprofitable. * * *"

Paragraph XII

"This sales contract shall be in full force and effect from the beginning of production by Party of the First Part and continue for at least 50 months, but under no circumstance shall expire until the mortgage by Party of the First Part to Oregon Plywood Corporation shall be paid in full."

Paragraph XIII

"It is understood and agreed that if the Party of the First Part is unable to produce because of fire, earthquake, disaster or act of God, this contract shall continue in full force until the mortgage heretofore mentioned is paid in full."

Paragraph XIV

"It is further agreed that Party of the Second Part shall acquire one share of stock in Party of the First Part, and Party of the First Part shall keep a representative of Party of the Second Part upon its Board of Directors until the mortgage given by Party of the First Part to Oregon Plywood Corporation shall be paid in full, at which time said share of stock shall be surrendered to

In addition to the sales contract a loan agreement was executed between Sutherlin and Oregon Plywood Corporation which provided for two types of loans to Sutherlin, namely, the loan of $30,000 to be secured by notes and a mortgage at 4% interest, and the advance of the cost of green veneer (security title retained therein by lender) at no interest. A note was also executed to Oregon Plywood Corporation for the first $50,-000 loaned, and also there was executed an open-end mortgage to Oregon Plywood Corporation to secure said note and future loans.

In January, 1954, Sutherlin commenced to operate its newly constructed mill and to sell to appellant 80% of its actual output. However, operations were unprofitable from the beginning; and by April 21, 1954, Sutherlin had lost more than $110,000, had exhausted its working capital and credit and had twice failed to meet its payroll on time. Because of the cash depletion, Sutherlin terminated production on April 21, 1954, and thereafter had no output. Efforts were made to obtain additional financing but with no success. In June, 1954, the stockholders authorized the directors to sell or lease the mill; on July 28, 1954, the directors (at a meeting attended by appellant's officer and director, Robert F. Hofheins) recommended a sale or lease of substantially all the assets of the corporation. In August, 1954, the corporation accepted an offer from J. R. Adams and Norman Jacobson for the sale and purchase of its physical assets. Adams and Jacobson caused appellee, Nordic Plywood, Inc., to be incorporated, and sale was made to Nordic in September, 1954, for $660,000, payable $20,000 down and $5,500 a month without in-

terest. Installments on the purchase price were to be paid into escrow and distributed to creditors with any remaining sums distributed to Sutherlin and its stockholders. The loans from Oregon Plywood Corporation were paid and a new mortgage taken by a bank. There is no organizational relationship between Sutherlin and Nordic.

Appellant brought this action against Sutherlin for breach of the sales contract and also against Nordic for unlawfully interfering and inducing the breach thereof. The District Court held that appellant failed to sustain the burden of proving that Sutherlin promised or represented to appellant that it would continue in operation for at least 50 months or for any other period of time. The court held that under the agreements Sutherlin could dispose of its physical assets in the event it should determine to do so in good faith and in the exercise of honest business judgment or in the event conditions made it unprofitable to continue or it was prevented from continuing production of plywood. The court further held that bad faith was not shown in Sutherlin's ceasing operations or selling its mill, and therefore Sutherlin was excused from further production by reason of its financial losses, insolvency and inability to produce further. The District Court also held that appellee Nordic did not induce a breach of the sales contract and was privileged to purchase the physical assets of Sutherlin. Appellant appeals from that judgment.

The Appeal

█ Appellant cites twenty specifications of error, but the case can be boiled down to two basic questions.[2] The first question is whether under the sales con-

Party of the First Part upon Party of the Second Part being paid the original purchase price therefor."

2. We note that under Paragraph I of the Sales Contract, appellant is not required to order any plywood from Sutherlin. But Paragraph VII requires appellant to "use its best effort" to maintain a 30-day order file at the mill. Paragraph

VIII (See Footnote 1) would appear to decrease any detriment to appellant as a result of Paragraph VII. Issues as to consideration, mutuality and lack of certainty are only incidentally raised in the briefs and were not discussed by the trial judge in reaching his decision. We likewise find it unnecessary to further consider such issues based on our decision herein.

tract, Sutherlin expressly or impliedly promised to operate continuously during the term of the agreement. Paragraph XII states that the contract shall be in force for at least fifty months from the beginning of production, but there is no provision which clearly states that Sutherlin will have an "output." Appellant argues that the plain import of Paragraph XII, when read in conjunction with Paragraph XIII, which reads:

"It is understood and agreed that if the Party of the First Part is unable to produce because of fire, earthquake, disaster or act of God, this contract shall continue in full force until the mortgage heretofore mentioned is paid in full."

indicates that the parties intended that the conditions enumerated in Paragraph XIII were not to excuse Sutherlin from performance. Appellant then presupposes a situation where fire damage to the mill causes a temporary inability to produce. Appellant argues that in such a situation, Paragraph XIII is applicable and the contract would remain in full force. From this premise, appellant then argues if temporary inability to produce was not to relieve Sutherlin from continuing production, a fortiori, it was not to be excused where fire, earthquake, etc., had not prevented production. We find the argument without merit. Implied conditions are not lightly to be presumed. Paragraph XIII does not permit us to imply a condition that there will be a continued output. Suppose we assume that a fire completely destroyed the mill. Paragraph XIII states the contract is still in force "until the mortgage heretofore mentioned is paid in full." It is obvious that there would be *no* output in such a situation. It appears that Paragraph XIII is nothing more than an inartfully drawn paragraph which was inserted to protect the mortgage involved. Any other intent is not clear.

Appellant cites other paragraphs of the sales contract in support of its argument that a continued output is required. We have examined each such paragraph and hold that in and of themselves, they do not expressly bind Sutherlin to have an output.

■ We now consider the case as an ordinary output contract. Output and requirements contracts are today normally held to be enforceable even though the promisor does not promise to sell or buy any specific amount. A legal detriment is found in the relinquishment of the promisor's right to have output or requirements and yet not sell or buy the same to or from the promisee. 1 Williston on Contracts, Rev.Ed., § 104a, p. 353.

Many cases have considered the duties or obligations of the parties under an output or requirements contract. Each case appears to turn on its own facts. We hold the following quotation found in In re United Cigar Stores, 2 Cir., 72 F.2d 673, 674, is applicable to the instant case:

"As a matter of law, the bankruptcy of one of the parties to an executory contract does not excuse his performance and, with exceptions not here relevant * * * a claim based on nonperformance because of bankruptcy is provable against the bankrupt estate * * *. But probability in bankruptcy is not the issue here, or at least is only a contingent one, for the primary question is whether there has been any breach of the contract at all. Though bankruptcy may not excuse a breach, it may have so changed the buyer's requirements that this contract was not broken. When parties contract with reference either to the requirements of the buyer or the output of the seller, there is necessarily a degree of uncertainty of amount. The very circumstances which make it impossible for the parties to know definitely when the contract is made, how much it will cover makes it necessary for each of them to assume the risk of future events beyond the control of either when acting in good faith, which may vary the quantity of the subject matter. The proper division of this risk and the limits to which it

may go has led courts to entertain divergent views. * * *

"There are many decisions to the effect that the obligation on the part of a buyer in a requirements contract to continue to have requirements without substantial variance is not to be implied more strictly than to impose upon him the obligation to act in good faith. He is bound to buy from the seller to the extent that he may have requirements when he is left free to deal with his business as he may deem best, provided his conduct is bona fide. In this respect there is no difference in principle between what is called a requirements contract and an output contract. Illustrative cases are Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622; H. M. Pfann & Co. v. J. C. Turner Cypress Lumber Co., 5 Cir., 194 F. 69; * * *.

"The weight of authority is in accord with the decision in Brawley v. United States, supra, where it was held that, though in a contract for the purchase of what wood an army post would require for a year the amount was stated to be 880 cords, more or less, actual requirements of the buyer, even though only 40 cords, determined the contract amount in the absence of bad faith. * * * Since requirements of the buyer may decrease or increase as business conditions fluctuate and be met by the inherent elasticity of a requirements contract, provided the conduct of the buyer is bona fide, there can be no rational distinction between decreases stopping short of total extinction and those which do not. * * .* " See also In re United Cigar Stores Co. of America, D.C., 8 F.Supp. 243.

This Court, in William S. Gray & Co. v. Western Borax Co., 9 Cir., 99 F.2d 239, 242, adopted the so-called "good faith" test. That case involved an agreement whereby a manufacturer appointed another company "its sole and exclusive agent for the sale in the United States of all the borax * * * boric acid and other products *produced* by the" manufacturer. (Italics supplied.) The manufacturer discontinued production because "it would be impossible for it to continue in the business operating its mining properties and producing its products and marketing the same, either at a profit or without accumulating further losses and indebtedness which ultimately would force a cessation of operations in the production of refined borax." This Court held that there was no breach in the contract even though the agreement contained a provision that it would continue in effect for a definite period. This Court refused to imply a promise that the manufacturer would retain the borax producing property during the whole of the period irrespective of whatever circumstances might arise. We also cited In re United Cigar Stores Co., supra.

Appellant in the instant case argues, though, that the United Cigar cases and William S. Gray & Co. v. Western Borax Co., supra, are not applicable under the facts of the instant case and that Diamond Alkali Co. v. P. C. Tomson & Co., 3 Cir., 35 F.2d 117, 119, is controlling. We do not agree and hold the case is limited to its own facts. The Diamond Alkali case involved an agreement whereby plaintiff agreed to manufacture and sell, and defendant to purchase the entire requirements of defendant for a period of five years. But, significantly, the defendant agreed "not to sell, lease or enter into any contract for the operation of its manufacturing plant at Fairport without the consent of the Alkali Company during the continuance of this agreement." The Third Circuit implied a continuance of the contract under the circumstances of the case. We also note that the defendant in the Diamond Alkali case intended to operate for the full five years "until an unexpected opportunity to make 'an advantageous sale' presented itself."

We likewise hold that Texas Industries v. Brown, 5 Cir., 218 F.2d 510, 512,

is not controlling. The court, in Texas Industries, inferentially approved of the requirement that the seller impliedly promised "to continue in good faith sales or production." But the court found a breach of the contract for several reasons. The production plants involved were not shut down and had never ceased to operate and have requirements. The court also noted that Paragraph 13 of the contract provided that a sale, exchange, merger, etc., was permissible, but that the contract would be binding upon the successor organization. Other cases[3] cited by appellant we find inapposite in the instant case.

 From what we have heretofore said, we hold that it need be shown only that Sutherlin ceased operations in good faith.[4] We find without merit the argument advanced by appellant that the instant case involved "an advantageous sale."

The District Court, in Finding of Fact VIII, states that Robert F. Hofheins, who conducted the original negotiations on behalf of appellant, knew the financial condition of Sutherlin and that it was in weak financial condition and in dire need of working capital. The Court further found that appellant knew

Sutherlin might not be able to operate profitably and might be compelled to shut down.

Finding of Fact XIII states in part:

"At the time it [Sutherlin] ceased operations, it was and at all times since that date it has been unable to pay its obligations as they mature."

Other findings we need not set forth, but suffice it to say that they clearly support the conclusion that Sutherlin discontinued output in good faith. We have made an exhaustive search of the transcript and find ample evidence to support each and every finding of fact. To answer every argument of appellant would needlessly lengthen this opinion and serve no useful purpose. The evidence as to good faith is so strong that it is the only conclusion that could have been reached by the District Court. We cite in the margin a statement made by the trial judge with which we find support in the record and with which we agree.[5]

Because we hold that Sutherlin is not in breach of contract, it becomes unnecessary to discuss the second issue of the case as to whether Nordic Plywood, Inc., induced a breach of the contract. Suffice it to say that the District Court's

3. Wells v. Alexandre, 130 N.Y. 642, 29 N.E. 142, 15 L.R.A. 218, is of no aid to a determination of issues in the instant case. That case merely held that a more or less definite quantity of coal was agreed to be purchased by defendant and such agreement could not be avoided by selling the steamers which were to use the coal.

Central States Power & Light Corp. v. United States Zinc Co., 10 Cir., 60 F. 2d 832, is not strong authority for any position. The concurring opinion of Judge Lewis interpreted the contract involved as not being a requirements contract. We note that the dissenting opinion by Judge McDermott is more or less in accord with the view we herein adopt.

A recent comment found in New York University 12 Intramural Law Review 146, we find of no assistance since the article makes statements much too broad and qualified by cases other than those mentioned.

4. See also William C. Atwater & Co. v. Terminal Coal Corporation, 1 Cir., 115

F.2d 887 and D.C., 32 F.Supp. 178, where a good faith test was also applied.

5. "The Court: I am convinced on the basis of the testimony now that the company was in a difficult position at the time that they closed and that it could not meet its payroll; that they made attempts to refinance and could not refinance, and that they probably did all they could do in order to salvage what they had. On the basis of the testimony I have heard yesterday, even without seeing the financial statement, I am convinced that Mr. Hofheins knew that he was not dealing with the United States Steel Corporation or the U. S. Plywood Corporation. He knew he was dealing with a company that was just getting started, with a considerable portion of the capital being put up by the people who were working in the plant, and that the officers of the corporation would be people who had limited experience in dealing with the operation of a plywood plant.

findings as to failure of proof to inducement of a breach and as to the purchase by Nordic being privileged, are fully supported by the evidence.

Judgment affirmed.