**HML CORPORATION**

v.

**GENERAL FOODS CORPORATION.**

Civ. A. No. 30735.

United States District Court
E. D. Pennsylvania.
Jan. 6, 1965.

Joseph G. Denny, III, Philadelphia, Pa., for plaintiff.

Lewis H. Van Dusen, Jr., R. Philip Steinberg, Philadelphia, Pa., for defendant.

WOOD, District Judge.

This contract action was tried to the Court without a jury from December 7, 1964, to December 10, 1964. At the close of the plaintiff's evidence the defendant moved for an involuntary dismissal under Rule 41(b) which was granted by the Court. Therefore, in accordance with Rule 52(a) we find the following:

## FINDINGS OF FACT

1. The plaintiff, HML Corporation (HML) (formerly Lamaze Foods, Inc.) is a Pennsylvania corporation with its principal place of business located in Philadelphia, Pennsylvania.

2. At the time of the institution of suit, January 5, 1962, HML was a food manufacturer.

3. The defendant, General Foods Corporation (General Foods) is a Delaware Corporation with its principal place of business situated in White Plains, New York.

4. The amount in controversy exceeds $10,000.00.

5. Plaintiff's predecessor corporation prior to 1956 was the owner and registrant of the trademarks "Cream Wipt" and "SalaDream" covering certain food dressing products.

6. In 1956 and 1957, General Foods adopted and used the trademark "Dream Whip" which was a dessert topping mix.

7. Litigation arose when the defendant attempted to register the trademark "Dream Whip" with the United States Patent Office in 1956 and 1957.

8. The plaintiff successfully opposed the defendant's application to register its trademark because of the likelihood

that confusion in the trade would result. Cream Wipt Foods, Inc. v. General Foods Corporation, 278 F.2d 521, 47 CCPA 968 (1960).

9. Thereafter, on September 14, 1960, plaintiff and defendant entered into two agreements to resolve the trademark dispute between them.

10. The first agreement denominated herein as the "Main Agreement", provided for the sale by the plaintiff to General Foods of the trademarks "Cream Wipt" and "SalaDream" together with the good will of those trademarks and United States Patent No. 2,715,068 owned by plaintiff's president covering the production of a salad dressing containing milk solids and cream.

11. Section 10 of the *Main Agreement* provided for a closing date of October 31, 1960.

12. On or before the closing date General Foods paid $100,000 to the plaintiff for the transfer of the trademarks and $150,000 to plaintiff's president, Harry M. Levin (Levin) for transfer of the patent.

13. The recital clauses of the *Main Agreement* specifically state that the basis of the Agreement was to settle the trademark dispute and to permit General Foods to continue its use of the trademark "Dream Whip."

14. Section 7 of the *Main Agreement* states that the parties will "execute in good faith a mutually satisfactory agreement for the supply to General Foods by Wipt of said food dressing products."

15. Section 19(d)(ii) of the *Main Agreement* entitled "Conditions" recites that General Foods' obligations are subject, to the receipt by General Foods, at the time of closing, of an executed supply agreement as provided in Section 7.

16. Section 22 of the *Main Agreement* restricts the entire agreement of the parties to the written instrument and provides that modifications, alterations or changes must be in writing.

17. The second agreement, known as the "Supply Agreement", provided that General Foods would order from the plaintiff not less than 85% of General Foods' *requirements* in a specific geographic region for certain food dressing products previously manufactured and processed by the plaintiff.

18. Section 22, subsections (a) and (b) of the *Supply Agreement* provided that the written instrument constituted the whole agreement between the parties and that no representations or statements were made by officers or representatives of General Foods which would "add to, modify, or change any one or more of the provisions of this agreement." Also, any enlargement or modification of the agreement had to be in writing to be effective.

19. The *Main Agreement* and *Supply Agreement* were executed by the plaintiff's President, Levin and E. W. Kelley, Treasurer of General Foods, on September 14, 1960, and both agreements went into effect on October 31, 1960.

20. After both agreements had been signed on September 14, 1960, Levin discovered two errors relating to processing charges in the written instruments which were corrected at his request by an amendment dated October 28, 1960.

21. Other than the two errors discovered by Mr. Levin, no other oral or written additions, changes or modifications were made by the parties before or after the closing date, October 31, 1960.

22. There is no written provision in either agreement obligating General Foods to promote, sell or expand the market for the food dressing products covered by the *Supply Agreement*.

23. Levin knew before the two agreements were executed that General Foods intended to proceed cautiously with the marketing of the food dressing products, and that General Foods intended to conduct marketing investigations and surveys concerning the food dressing products.

24. Following the closing date, on November 1 and 2, 1960, six representatives of General Foods visited the plaintiff's plant to familiarize themselves with the plaintiff's method of manufacturing, and to evaluate the products to be sold by General Foods.

25. Samples of the plaintiff's products were taken by Mr. Feldman, a General Foods employee, for use in making tests by the defendant.

26. Mr. Whitcomb, a General Foods employee, visited the plaintiff's factory on at least six occasions between November and December, 1960, and discussed with Levin the experimentation and research being conducted by General Foods.

27. Plaintiff's attorney, Mr. Denny, with Levin's permission, was consulted by General Foods in connection with consumer research being conducted by the defendant, and wrote to General Foods with regard thereto.

28. General Foods appointed five brokers, in Philadelphia, Pittsburgh, Erie, Baltimore, and New York to handle the sale of the food dressing products covered by the *Supply Agreement,* and advised the plaintiff accordingly.

29. Sample cases, pictures and slides were prepared by the defendant for use in promoting the food dressing products.

30. General Foods reimbursed the plaintiff for certain advertising costs which the plaintiff incurred pursuant to contracts in effect on November 1, 1960, until December 31, 1960.

31. Mr. Whitcomb of General Foods called on the trade in Pittsburgh, Pennsylvania, to encourage customers to sell the food dressing products.

32. On February 17, 1961, W. Parlin Lillard, Vice President of General Foods, notified the plaintiff orally and in writing that General Foods had decided to discontinue the sale of the food dressing products covered by the *Supply Agreement.*

33. In a letter dated February 17, 1961, addressed to Levin, Mr. Lillard specifically based General Foods' business decision to discontinue the marketing of the food dressing products upon the tests, investigations and research which General Foods had been conducting.

34. From November 1, 1960, through March 27, 1961, General Foods purchased all of its requirements (19,440.1 gallons) of the food dressing products from the plaintiff, and no claim has been made nor evidence produced which indicates that General Foods purchased such products from anyone else.

35. Under the *Supply Agreement* and its amendment the plaintiff was entitled to receive from the defendant the actual cost of raw materials of all products ordered by General Foods and a graduated processing and profit factor for each case of food products so manufactured, plus one-half of the gross profit in excess of 28% on all food products purchased by General Foods.

36. Plaintiff received payment from the defendant for all raw material costs and for all finished products purchased by General Foods during the term of the Agreement.

37. The plaintiff produced no evidence that the defendant earned any gross profit in excess of 28% during the period that it was purchasing food products from the plaintiff.

38. The *Supply Agreement* did not specify any *minimum quantity* of products which General Foods was obligated to purchase during the term of the contract.

39. There was no evidence of any probative value that the tests, investigations, research and surveys were performed in bad faith.

40. There was no evidence of any probative value that General Foods' decision to discontinue the sale of the food dressing products was made in bad faith.

41. Plaintiff failed to prove by competent testimony, other than the unsupported opinions of its accountant, just what quantity of goods General Foods

would have ordered and the resulting cost to plaintiff of filling these orders, and the amount of profit, if any, which the plaintiff would have earned.

42. The plaintiff's factory was destroyed by fire on January 1, 1963, and on January 7, 1963, General Foods terminated the *Supply Agreement* in writing in accordance with paragraph 20 thereof.

43. Under the *Main Agreement* the plaintiff admits that it has received full payment. We further find that the plaintiff has received full payment from General Foods for all products purchased under the *Supply Agreement*.

## DISCUSSION

The plaintiff contends, in this action, that General Foods acted in bad faith in discontinuing the sale of certain food dressing products covered by a *Supply Agreement* between the parties. In support of this allegation the plaintiff offered testimony concerning certain conferences and discussions which were held between representatives of General Foods and Mr. and Mrs. Levin, officers of the plaintiff corporation. These discussions and conferences occurred both before and after the signing of the contract. The subject matter of these meetings concerned extensive advertising and promotion plans which the plaintiff claims General Foods' executives orally promised to put into effect to promote the sale of the food dressing products.

■ During the trial we allowed such parol evidence over the strenuous objection of the defendant's counsel and reserved our ruling on its admissibility and materiality until the close of the case. It is the Court's opinion that such testimony should have been excluded because it was intended to vary or modify rather than explain the elaborate written agreements contrary to the express representations contained in both written instruments. There was no provision in either agreement which required General Foods to extensively promote and advertise these food products.

We cannot inject such an important implied obligation into the Agreements, which neither party saw fit to include expressly. Whatever method of offering these food products to the public that General Foods deemed advisable was a business judgment left to its sound discretion by the plaintiff. We cannot find bad faith merely because the plaintiff feels that in its judgment extensive national advertising was the best way to insure the success of the promotion.

■ Also, since this was a *requirements contract* with no minimum quantity stated, the defendant was not obligated to purchase food products from the plaintiff in the absence of any such requirements. The defendant was not bound to perform this Agreement to its detriment, if it found in good faith that it no longer had any need for further requirements. In Re United Cigar Stores Co., 7 F.2d 673, 675 (2 Cir. 1934), cert. denied, Consolidated Dairy Products Co. v. Irving Trust Co., 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934); accord, Oregon Plywood Sales Corp. v. Sutherlin Plywood Corp., 246 F.2d 466, 469, 470 (9 Cir. 1957); see Du Boff v. Matam Corp., 272 App.Div. 502, 71 N.Y.S.2d 134 (1st Dept. 1947); see also Rubinger v. International Telephone & Telegraph Corp., 193 F.Supp. 711, 718 (S.D.N.Y.1961) aff'd. 310 F.2d 552 (2 Cir. 1962) cert. denied 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction.

■ 2. The interpretation of both Agreements is governed by New York Law.

3. We conclude from our examination of Sections 7 and 19(d) (ii) of the *Main Agreement* and from a consideration of all the paragraphs of the *Supply Agreement* that the primary purpose of the *Supply Agreement* was to provide General Foods with a ready source of supply of food dressing products according to its requirements.

4. Absent any requirements for such food products General Foods had no obligation under both Agreements either express or implied to continue to place orders with the plaintiff.

5. We conclude from our examination of both detailed Agreements that the parties intended both written instruments to be the complete integration of all their acts and that they specifically provided against oral modifications in Article 22 of the *Supply Agreement* and Section 22 of the *Main Agreement*.

6. Under the *Main Agreement* and the *Supply Agreement* the defendant had no obligation either express or implied to promote, sell, advertise or expand the market for the food dressing products covered by the *Supply Agreement*.

7. Under the parol evidence rule, the intent of the parties having been expressed in both Agreements to exclude oral modifications or agreements, all testimony regarding oral discussions concerning advertising and promotion not contained in the Agreements was legally ineffective to prove an agreement to advertise or promote the food dressing products.

8. The plaintiff failed to establish that General Foods' conduct under the *Supply Agreement* was not bona fide, or that its decision to discontinue marketing the food dressing products was made in bad faith.

9. Plaintiff failed to prove by competent evidence any basis upon which an award of damages could be made by the Court.

10. The plaintiff has shown no right to relief.

### ORDER

And now, this 6th day of January, 1965, it is ordered that the plaintiff having failed to show any right to relief that its cause of action is dismissed and judgment is entered in favor of the defendant, General Foods Corporation.