TECHNICAL ASSISTANCE
INTERNATIONAL, INC.,
Plaintiff–Appellee,

v.

UNITED STATES, Defendant–Appellant.

No. 97–5112.

United States Court of Appeals,
Federal Circuit.

Aug. 4, 1998.

Howell R. Riggs, Jr., Riggs and Associates, Pensacola, Florida, argued for plaintiff–appellee.

Margaret L. Baskette, Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, argued for defendant–appellant. On the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Sandra P. Spooner, Deputy Director, and Anne M. McCormick, Attorney.

Before LOURIE, CLEVENGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This case requires us to determine how much freedom the government has to vary its requirements when it enters into a requirements contract. The government entered into a requirements contract with Technical Assistance International, Inc., (TAI), pursuant to which TAI was to maintain and repair the Army's vehicle fleet at the White Sands Missile Range. The United States Court of Federal Claims held that when the government increased the rate at which it replaced the older vehicles in the fleet, and thus decreased its requirements for vehicle maintenance and repair services, the government violated its contractual obligations to TAI. We reverse.

I

In early 1992, the Army consolidated its fleet of general purpose vehicles at the White Sands Missile Range into the Interagency Fleet Management System. The Interagency Fleet Management System is a federal agency service program under which the General Services Administration (GSA) assumes ownership of and maintenance responsibilities for fleets of vehicles formerly owned and maintained by various federal agencies. The purpose of the program is to achieve economies of scale in the purchasing, management, and servicing of such fleets.

The average age of the vehicles in the Army's White Sands fleet before being transferred into the GSA program was eight years. One of the Army's goals in consolidating its fleet into the GSA program was to bring the fleet up to GSA standards, which call for vehicles to be replaced after three to six years of use (depending on vehicle type

and mileage). Because GSA could not afford to replace all of the Army's old vehicles at once, it committed itself to bringing the Army's fleet up to its replacement standard over a five-year period. Of particular relevance to this case, GSA and the Army agreed that during the first year of consolidation, GSA would replace at least 30% of the vehicles eligible for replacement, and perhaps a higher percentage if it had the resources to do so.

GSA does not service and repair vehicles itself, but instead hires on-site contractors to perform those services. On November 15, 1991, GSA issued a bid solicitation for a requirements contract for the maintenance and repair of the White Sands vehicle fleet. As part of that solicitation, GSA prepared an estimate of the fleet's maintenance and repair needs, itemized by service types. Because GSA had not previously procured maintenance services for the White Sands fleet, it did not have any historic bid or price data to use in formulating the estimate. Instead, GSA based its estimate on a number of factors, including the number and types of vehicles in the fleet, the terrain and typical use of vehicles at White Sands, a review of GSA service contracts at similar sites, and GSA's commitment to replace at least 30% of the vehicles eligible for replacement during the first year of consolidation.

GSA awarded the contract to TAI on March 30, 1992. The contract term began on May 1, 1992, and was to run for one year, with two one-year options to renew at the government's discretion. Within two months of beginning performance, TAI projected that the work required for the White Sands fleet was going to fall considerably short of GSA's estimate. TAI submitted a request for an equitable adjustment based on the projected shortfall, as well as a certified claim for compensation based on a charge that GSA's contract estimate was prepared negligently. GSA denied the requested relief.

TAI subsequently filed suit in the Court of Federal Claims. The complaint alleged that TAI suffered damages as a result of the government's negligent estimate preparation. On cross-motions for summary judgment, the trial court ruled that the government had not been negligent in the preparation of its estimate, but the court nonetheless held that the government had breached its obligations under the contract and that TAI was entitled to relief.

In reaching its decision, the court relied on testimony from Virlene Griffin, the Group Leader of Operations for GSA's Fleet Maintenance Division, that during the first year of consolidation, GSA replaced more than twice the number of vehicles it had expected to replace. Ms. Griffin testified that there were a number of factors that resulted in the accelerated replacement rate, including the downsizing of GSA fleets at several nearby locations, the grant of permission from the Office of Management and Budget for GSA to acquire new cars through leasing as well as purchasing, and the delivery of new vehicles that had been ordered before the consolidation of the Army's fleet.

The court held that when a contractor enters into a requirements contract, it assumes only the risk of a change in requirements caused by to the "vagaries of user demand." *Technical Assistance Int'l, Inc. v. United States,* No. 93–68 C, slip op. at 2 (Fed.Cl. Feb. 8, 1996). The court regarded the accelerated rate at which GSA replaced the fleet's older cars to have been prompted by fleet surpluses at other locations, rather than by a change in the "indigenous needs" of the facility that TAI contracted to serve. *Technical Assistance Int'l, Inc. v. United States,* No. 93–68 C, slip op. at 1 (Fed.Cl. May 23, 1997). The court reasoned that TAI had not assumed the risk that GSA would increase the rate of replacement of the White Sands fleet in the event other GSA fleets developed a surplus. For that reason, the court concluded that when the government reduced its requirements by increasing the replacement rate for the White Sands fleet, the government effected a constructive change in the contract and breached its contractual obligations to TAI.

II

A

A requirements contract is primarily designed to provide a buyer with flexibility in

operating its business. The buyer is likely to enter into such a contract when its needs are unpredictable and it wishes to preserve for itself the freedom to determine its level of consumption and to conduct its operations according to its best business judgment. *See* John C. Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC,* 1973 Duke L.J. 599, 609–18. The buyer is generally accorded significant freedom in determining its requirements under a requirements contract because it has specifically bargained for such flexibility, in exchange for which it has usually agreed to pay a premium price for the goods or services to be provided. *See Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 276 F.2d 1, 7 (1960) ("we must assume that any ... risk of loss was considered by the parties, and that the accepted contract price bid reflected a satisfactory resolution of the risk"); *see also Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992) ("[In a requirements contract,] the risks associated with variance between actual purchases and estimated quantities are allocated to the contractor."); Weistart, *supra,* at 611, 619–20 (citing 3 A. Corbin, *Contracts* § 569 (1960)).

Nevertheless, the law imposes some limits on the buyer, lest it be permitted to vary its requirements to such an extent that the seller is exposed to an undue risk of severe economic hardship. *See* Weistart, *supra,* at 618 (requirements contracts, "if enforced to the letter without equitable restraint, may produce instances of severe oppression, verging on the unconscionable"); *id.* at 639–43; *cf. Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1339 (7th Cir.1988) (holding that a requirements contract is more than merely an option for the buyer to purchase the covered goods or services).

■ The limitation on the buyer's freedom to vary its requirements is usually expressed as a duty to act in good faith. *See Shader Contractors,* 276 F.2d at 4 ("Ordinarily, where the quantity ordered is considerably more or considerably less than that anticipated from a reading of the contract terms, the courts will protect the aggrieved party from unfair usage by applying a test of good faith to the other party's actions."); *Big Horn*

*Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 n. 11 (10th Cir.1988) (citing cases from the Third, Seventh, and Tenth Circuits); *Oregon Plywood Sales Corp. v. Sutherlin Plywood Corp.,* 246 F.2d 466, 469–71 (9th Cir.1957) (citing *In re United Cigar Stores Co. of Am.,* 72 F.2d 673, 674–75 (2d Cir.1934)); Uniform Commercial Code § 2–306(1) ("requirements of the buyer means such actual ... requirements as may occur in good faith"); Weistart, *supra,* at 620–22; 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 2.15, at 119 (1990); 2 *id.* § 7.17, at 312.

■ A buyer acts in good faith if it has a valid business reason for varying its requirements other than dissatisfaction with the contract. *See Empire Gas,* 840 F.2d at 1340 ("[A] seller is entitled to expect that the buyer will buy something like the estimated requirements unless it has a valid business reason for buying less."); Weistart, *supra,* at 628 n. 71 ("The good faith standard has often been expressed in terms of its relationship to the buyer's business judgment."). "Bad faith" includes actions "motivated solely by a reassessment of the balance of advantages and disadvantages under the contract." *Empire Gas,* 840 F.2d at 1341. That is, if the buyer "had second thoughts about the terms of the contract," and decreased its requirements in an attempt to avoid its obligations under the contract, the buyer is deemed to have endeavored to manipulate the contract and thus to have acted in bad faith. *Id.* at 1340–41; *see also* Weistart, *supra,* at 647.

■ The Uniform Commercial Code contains a separate restriction on the buyer's freedom to vary its requirements, *see* Uniform Commercial Code § 2–306(1) (buyer of goods cannot demand a quantity "unreasonably disproportionate to any stated estimates"), but it is unclear how much that additional restriction adds to the obligation of good faith. In any event, the Uniform Commercial Code is not binding with respect to government contracts, *see GAF Corp. v. United States,* 932 F.2d 947, 951 (Fed.Cir. 1991), and we decline to adopt the Uniform Commercial Code standard here.

TAI argues that another limitation should restrict the government's ability to vary its requirements: A variation should not be permitted if it is occasioned by a decision on the part of the government that "materially alter[s] factors upon which the estimates are based." According to TAI, if the government makes any decisions that affect the factors that formed the basis for the contract estimate, the government must compensate the contractor for any losses it suffers as a result.

We reject TAI's proposed limitation, because it would severely hamper the government's ability to adjust its requirements in accordance with its true needs and thus would undermine the primary function of a requirements contract—to permit the government to operate its business according to its business judgment when its needs are uncertain or unpredictable. In essence, TAI's limitation would require the government to commit itself "to go through with whatever project generated the estimate of required quantity, no matter what happened over the life of the project," *Empire Gas Corp.*, 840 F.2d at 1338, a result that has been clearly rejected by the long line of cases that have permitted buyers to discontinue their businesses and thereby eliminate their requirements altogether, as long as they do so in good faith. *See id.* at 1338–39; 3 Richard A. Lord, *Williston on Contracts* § 7:12, at 249 & n. 1 (4th ed.1992).

■ In sum, we hold that the only limitation upon the government's ability to vary its requirements under a requirements contract is that it must do so in good faith. Our holding is in accord with numerous decisions from other courts. *See, e.g., HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3d Cir.1966) ("the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements"); *Oregon Plywood Sales Corp.*, 246 F.2d at 470–71; *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.*, 102 F.2d 630, 632–33 (10th Cir.1939); *In re United Cigar Stores Co. of Am.*, 72 F.2d at 675 ("There are many decisions to the effect that

the obligation on the part of a buyer in a requirements contract to continue to have requirements without substantial variance is not to be implied more strictly than to impose upon him the obligation to act in good faith."); *see also* Note, *Requirements Contracts, "More or Less," Under the Uniform Commercial Code*, 33 Rutgers L.Rev. 105, 120 (1980) (noting that at least with respect to decreases in requirements, "[a]lmost every court has stated that good faith constitutes the sole limitation" on the buyer). That rule has the benefit of simplicity, and it enables the government to take full advantage of the flexibility for which it has bargained. Of course, the seller can control the risk that a requirements contract may result in harsh consequences by incorporating minimum and maximum quantity terms, or other similar provisions, into the contract. *See* Weistart, *supra*, at 619, 648; *see also* Farnsworth, *supra*, § 7.17 n. 10 (1990).

B

■ The party alleging a breach of contract bears the burden of proving the breach. *See Perry v. Department of the Army*, 992 F.2d 1575, 1577 (Fed.Cir.1993). Thus, in a requirements contract case in which the seller alleges that the buyer breached the contract by reducing its requirements, the burden of proof is on the seller to prove that the buyer acted in bad faith, for example, by reducing its requirements solely in order to avoid its obligations under the contract. In the absence of such a showing, the buyer will be presumed to have varied its requirements for valid business reasons, *i.e.*, to have acted in good faith, and will not be liable for the change in requirements.

■ In the present case, TAI has neither alleged nor shown that the government altered its requirements in bad faith. The government introduced evidence that it had valid business reasons for incorporating available new vehicles into the White Sands fleet. Specifically, doing so enabled the government to "suffer less downtime" and resulted in "making a better fleet." TAI has not pointed to any evidence showing that the government's reduction in requirements was "motivated solely by a reassessment of the

balance of advantages and disadvantages under the contract," *Empire Gas*, 840 F.2d at 1341.

This case is very similar to *Southwest Natural Gas Co., supra*, in which the buyer in a requirements contract reduced its gas requirements as a result of having replaced an old, worn-out boiler with a new, more efficient boiler. The court concluded that the buyer did not breach the contract because it improved its plant "in good faith and in the exercise of prudent business judgment." 102 F.2d at 633. In this case, there was uncontroverted evidence that the government increased the vehicle replacement rate in a similar attempt to improve its fleet. Because the government "had a business reason for deciding [to make use of available new vehicles] that was independent of the terms of the contract ... with [TAI]," *Empire Gas*, 840 F.2d at 1339, the government acted in good faith. Accordingly, the government did not breach or constructively change its contract with TAI.

*REVERSED.*