ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| MPG West, LLC ) | ASBCA Nos. 61100, 61560, 61570 |
| ) | |
| Under Contract No. HDEC09-15-D-0002 ) | |

APPEARANCES FOR THE APPELLANT:    J. Travis Pittman, Esq.
                                   Yuki Haraguchi, Esq.
                                     Holmes Pittman and Haraguchi, LLP
                                     Greensboro, MD

APPEARANCES FOR THE GOVERNMENT:    Brian M. Lucero, Esq.
                                     Deputy General Counsel
                                   Nikki R. Musick Esq.
                                     Trial Attorney
                                     Defense Commissary Agency
                                     Fort Lee, VA

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal concerns a requirements contract with the Defense Commissary Agency (DeCA) to supply fresh fruits and vegetables (FF&V) to U.S. Military commissaries (*i.e.*, grocery stores) in Japan and South Korea. The contract specified "free on board" (FOB) destination delivery, so that the price of all imported products was to include "any costs associated with the transportation and customs clearance of [the] imported products." During the solicitation, DeCA acknowledged that the prices for FF&V would increase, because DeCA no longer would subsidize the cost of transporting FF&V from the United States. DeCA also communicated to all offerors that the winning contractor would need to source as much FF&V as possible from the local market, which would include locally available imported items.

After serving as a subcontractor to the incumbent contractor, MPG West, LLC (MPG West) won the contract in May 2015. After the start of the contract was delayed by a series of bid protests lodged by the incumbent contractor, MPG West began performance in November 2015. However, MPG West struggled from the outset, suffering financial losses relating to importing produce, including border inspections resulting in condemnation and disposal of unacceptable products, short notice airlifts to replace condemned produce, confusion regarding paperwork to clear customs, and failed sanitary audits for local storage and processing warehouses.

March 2016, MPG West submitted a request for equitable adjustment in the amount of $3.3 million, which it subsequently converted to a certified claim in the amount of $5,076,339.52. In May 2016, MPG West informed the government that it must receive an interim payment within seven days or it would have to phase down performance. On May 12, 2016, the government made a $2 million partial payment of the claim to MPG West. However, in June 2016, the government issued a cure notice to MPG West for failing to meet the contract requirements regarding fill rates and timely submission of market-basket surveys. Eventually, in July 2016, two subcontractors (EKK Investments and Interharvest Japan) effectively took over all of the cost and performance of the contract.

MPG West amended its claim to include additional costs associated with alleged losses incurred from October 2015 through February 2016, bringing its total claim amount to $10,952,546. In its claim, MPG West contended that DeCA negligently estimated the amount of goods it would need in the solicitation, failed to cooperate with the inspection process for imported goods, forced MPG West to sell its produce at prices below MPG West's costs of importation, and prevented MPG West from selling produce it imported. On January 3, 2017, the government issued a contracting officer's final decision (COFD) denying MPG West's claim, except for the $2 million it previously had paid to MPG West.

On March 21, 2017, MPG West appealed the COFD to the Board. In January 2018, the government moved to dismiss the portion of appellant's complaint relating to losses associated with the supply of bagged salads. MPG West then filed two new claims, one for bagged salad costs on a theory of constructive change, and one for the same costs based on the government's termination of the requirement. The contracting officer (CO) dismissed these claims as untimely on the grounds that they were filed after appellant had novated the contract and waived its rights to pursue future claims.

Appellant appealed the denial of its third and fourth supplemental claims to the Board and we consolidated them with this appeal. We deferred a ruling on the government's jurisdictional arguments regarding the portion of the appeals pertaining to bagged salad costs. On May 15-18, 2018, the Board held a three-day hearing.

We hold that we possess jurisdiction to entertain Count Three of MPG West's complaint, which seeks to recover $5,089,321 in costs associated with the bagged salad delivery requirement. On the merits, however, we conclude that MPG West has failed to carry its burden of proving either that the government breached the terms of the contract, or that the government constructively changed the contract. Because we conclude that MPG West is not entitled to recovery, we do not reach the issue of quantum.

FINDINGS OF FACT

1. The Defense Commissary Agency (DeCA or government) is an agency of the United States Department of Defense (DoD) whose mission "is to provide an efficient and effective worldwide system of commissaries for the resale of groceries and related household items at reduced prices to members of the uniformed services, retired members, dependents of such members, and other authorized patrons, to enhance their quality of life and to support military readiness, recruitment, and retention." DoD Directive 5105.55(3), March 12, 2008.

I. The Solicitation

2. On February 3, 2014, DeCA released Solicitation No. HDEC09-14-R-0002 to provide fresh fruits and vegetables (FF&V) to commissaries in South Korea, Japan, and Guam (app. supp. R4, tab 897).

3. The Solicitation required FOB destination delivery (app. supp. R4, tab 897).

4. The Solicitation was amended six times which included published questions and answers (app. supp. R4, tabs 898-903).

5. On February 24, 2014, the government amended the Solicitation to include the following:

> The contractor(s) shall be fully responsible to supply and if necessary import the required produce items. Therefore, companies submitting offers under subject solicitation must be able to comply with all host country laws and regulations for the import of agricultural products from all over the world. Any costs associated with the transportation and customs clearance of imported products must be included into the offered F.O.B. destination price. Items not available under Host National Law (Embargo) shall be identified to the Contracting Officer so that equal substitution can be considered or a determination can be made to product assortment.

(App. supp. R4, tab 898 at 7)

6. In response to questions regarding price, the government confirmed that offerors must provide a minimum savings of 15 percent as compared to local market prices (app. supp. R4, tab 900 at 7; answer ¶ 40).

3

7. The government confirmed in response to questions that it "allows contractors to adjust prices on a weekly basis. The prices have to be fair and reasonable and shall achieve the 15% patron savings." (App. supp. R4, tab 900 at 8; answer ¶ 46)

8. In responding to questions regarding sanitarily approved sources for produce, the government stated that processed produce items shall be obtained from approved sources in accordance with the regulations from the U.S. Army Public Health Command, the government agency responsible for approved sources with the DoD, and the U.S. Army Veterinarian Command, which assists with requests for sanitary inspections of companies seeking to become an approved source (app. supp. R4, tab 900 at 5; answer ¶ 32).

9. MPG West already was performing as a subcontractor on the prior contract for the incumbent for the past six or seven years (tr. 1/52, 55). MPG West's role in the incumbent contract included training personnel at the store level, contracting with trucking firms, and securing warehouses (tr. 1/55-57).

10. DeCA communicated to all offerors that the winning contractor would need to "locally source as much FF&V as possible from the local market, which would include locally available imported items" (app. supp. R4, tab 898 at 2).

11. DeCA was aware that the prices for FF&V would increase, because DeCA would no longer subsidize the cost of transporting FF&V from the United States (app. supp. R4, tab 898 at 2).

12. The solicitation included weekly estimated quantities by pound for each item on the High Volume Core Items (HVCI) list for each contract line item number (CLIN), based on the previous three years of consumption data under the incumbent contract (app. supp. R4, tab 897 at 83, 173).

13. MPG West submitted an offer and took no exception to the terms of the solicitation (tr. 1/151).

14. In its offer, MPG West identified Fresh Express as its preferred partner to provide bagged salads (tr. 1/152).

15. In its offer, MPG West proposed that it could achieve a Patron Savings Discount of 34 percent for Korea and 30 percent for Japan (tr. 1/107).

16. MPG West's proposal did not address or request any start-up or lead time (tr. 2/80).

II.  The Contract

17.  On May 22, 2015, the government awarded requirements Contract No. HDEC09-15-D-0002 (the contract) to MPG West, with a performance period beginning on July 1, 2015 (R4, tab 1).

18.  The contract contained two CLINs specifying delivery to commissary stores located in South Korea (CLIN 0001) and Japan (CLIN 0002) (R4, tab 1).

19.  The contract incorporated Solicitation No. HDEC09-14-R-0002 (R4, tab 1 at 2).

20.  The estimated value of the base period of performance, a twenty-four month period, was $55 million (R4, tab 1).

21.  The contract incorporated Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS COMMERCIAL ITEMS which read in pertinent part:

> (c)  Changes.  Changes in the terms and conditions of this contract may be made only by written agreement of the parties.
>
> . . . .
>
> (l)  The government reserves the right to terminate this contract, or any part hereof, for its sole convenience. . .  Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the government using its standard record keeping system, have resulted from the termination.

(R4, tab 1 at 22)

Additionally, the contract contained an addendum to this clause which read:  "SCOPE This contract is the primary source for fresh fruits and vegetables (FF&V) for commissary stores in the Pacific Area" (R4, tab 1 at 7).  The contract also contained: FAR 52.216-19, ORDER LIMITATIONS, which set forth the minimum and maximum ordering limitations that the contractor is not obliged to furnish under the contract; and

5

FAR 52.216-21, REQUIREMENTS, which pronounced that the quantities specified in the schedule are "estimates only" and if the government's requirements "do not result in orders in the quantities described as 'estimated' or 'maximum' in the schedule, that fact shall not constitute the basis for an equitable price adjustment." (R4, tab 1 at 25-26)

22. The "Statement of Requirements" section of the aforementioned addendum stated:

> [DeCA] will contract with one or more sources to provide [FF&V] to various DeCA commissary stores in South Korea and Japan. . . The contractor shall supply a full line of quality [FF&V] available world-wide that is better than or equal to U.S. Standards for Produce Grade #1 (Attachment 12) and Bagged Salads from companies listed in the Worldwide Directory of Sanitarily Approved Sources for Armed Forces Procurement (Attachment 12).

(R4, tab 1 at 7)

23. Attachment 11 to the contract specified that bagged salads should be sourced from Fresh Express (R4, tab 1 at 60).

24. The CO, Ms. Petra Pulze, testified that "Fresh Express was put in there because MPG West said they would deliver Fresh Express salads" (tr. 2/70).

25. The contract required FOB destination delivery to the DeCA commissaries in South Korea and Japan (R4, tab 1 at 7).

26. The contract provided that MPG West "shall be fully responsible to supply and import the required produce items if necessary." The contract required MPG West to "comply with all host country laws and regulations for the import of agricultural products from all over the world." (R4, tab 1 at 7) Under the contract, MPG West was:

> [R]esponsible for providing all necessary licenses, permits, supervision, facilities, equipment, order processing, distribution, inventory management, and personnel at the contractor's own facilities/distribution center to receive, store, handle, sort, and deliver all required FF&V items to the various commissary locations that are serviced under [the] contract.

(R4, tab 1 at 8)

6

27.  Any costs associated with the transportation and customs clearance of imported products were to be included in the FOB destination price (R4, tab 1 at 7).

28.  The contract required MPG West to identify to the CO any items not available under Host Nation Law (Embargo) so that equal or equivalent substitutions could be considered or a determination could be made regarding product assortment (R4, tab 1 at 7-8).

29.  The contract required MPG West to provide DeCA with all necessary support, order processing, electronic price updates, reporting, purchasing, distribution, and merchandising materials, and personnel necessary for the successful performance under the contract (R4, tab 1 at 8).

30.  Upon execution of the contract, DeCA and the Appellant were to establish a catalog of items that shall be available all of the time, as well as those items subject to seasonal change (R4, tab 1 at 8).

31.  The contract specified a fill rate requirement minimum of 98 percent, calculated based on the number of cases that are ordered but not delivered (R4, tab 1 at 16).  Items not delivered due to market conditions beyond MPG West's control would not impact the fill rate (R4, tab 1 at 16).  Likewise, unavailable items would not be included in the weekly catalog, and therefore would not impact the fill rate (tr. 2/67-68).

32.  The contract provided payment terms of NET- 10 days (R4, tab 1 at 17).

33.  Prices were to be updated on a weekly basis via txt file and order guide into the DeCA Produce Pricing System (R4, tab 1 at 9).  MPG West was to post the price, item and weight changes in its web-based ordering system by Thursday of each week in order to ensure correct pricing for the following Monday orders (R4, tab 1 at 9-10).  Prices were to be fixed price and inclusive of all costs, overhead and profit (R4, tab 1 at 10).  The contract required MPG West to mark all new items, price changes, different case weights or sizes and reflect the case price in the local currency as well as in US Dollars (R4, tab 1 at 9).  The contract required that:  "[t]he Government will monitor all other prices provided on the weekly price lists for being fair and reasonable considering the market conditions at the time" (R4, tab 1 at 10).

34.  The contract contained a "Patron Savings Requirement" applicable to 35 items of produce listed at Attachment 4 called "High Volume Core Items" (HVCI). The contract defined the Patron Savings Requirement as a price savings to the commissary patron when compared to the prices of like items from comparable private sector retail stores within the local commuting area of a commissary store in the host country.  Under the Patron Savings Requirement, MPG West warranted that prices for

7

the listed HVCI would provide a minimum percentage of savings when compared to the prices in comparable private-sector retail stores. (R4, tab 1 at 10)

35. As MPG West proposed in its offer, the contract required a 34 percent patron savings discount for South Korea during the base period (R4, tab 1 at 3; tr. 1/112). Similarly, the contract required a 30 percent patron savings discount for Japan during the base period (R4, tab 1 at 3; tr. 1/112).

36. The contract required the government to notify MPG West of fluctuations in patron volume that might impact sales (R4, tab 1 at 13, ¶ 12(a)).

37. The solicitation under which MPG West submitted its offer provided that DeCA "will contract with one or more sources to provide [FF&V] to various DeCA Commissary stores in South Korea, and Japan," and "[t]his contract is the primary source of [FF&V]" (R4, tab 897 at 26).

38. The contract contained DFARS 252.229-7000, INVOICES EXCLUSIVE OF TAXES OR DUTIES (Jun 1997), and 252.229-7001, TAX RELIEF - BASIC (Sep 2014) (R4, tab 1 at 28), and provided that the Appellant would be exempt from paying the Republic of Korea Value Added Taxes and Japanese Consumption Tax. (R4, tab 1 at 18).

39. The contract contained the following paragraph titled NOTICE OF CONTRACTOR RESPONSIBILITY TO HOST NATION:

> This is a Requirement Type Contract with a Contractor. As such, the Contractor is not an employee of the U.S. Government and it is solely the Contractor's responsibility to determine his/her reporting and payment responsibilities under Host Nation tax and labor laws. Status as a member of the U.S. Forces under the USFK and/or Japanese SOFA does not in itself relieve the Contractor of responsibilities under Host Nation laws. Contractor should consult appropriate authorities and advisors on these matters. Department of Defense military and civilian personnel will not provide advice in these matters. Contractor shall hold harmless the U.S. Government for any liability that may arise from the Contractor's noncompliance with Host Nation laws.

(R4, tab 1 at 19, ¶ 27)

40. The Technical Data Sheet, Attachment 10 to the contract, stated that the contractor:

[S]hall comply with all applicable host nation laws, Status of Forces Agreement (SOFA) between the Host Nations and the United States of America, import, phytosanitary inspection, custom clearance procedures, and all applicable laws, executive orders, rules and regulations applicable to its performance under this contract.

(R4, tab 1 at 57)

II. The Startup Period

41. MPG West began preparing for contract performance immediately upon receiving the contract award on May 22, 2015, including hiring personnel, contracting with local trucking companies, and taking steps to secure cold storage facilities in Japan and Korea (tr. 1/61-69, 152).

42. The original start date for contract performance, July 1, 2015, was delayed due to bid protest litigation (tr. 1/62).

43. One of the primary logistical issues was securing cold storage facilities in Korea and Japan so that the Contractor could have the produce available in-country to meet the 24-hour order requirement (tr. 1/62-63).

44. The contractor required three main cold storage facilities to perform the contract, one each in Korea, Japan, and Okinawa (tr. 1/62, 70, 89).

45. In order for the Contractor to use a cold storage facility to provide FF&V to the government, the facility must be audited and approved as safe and sanitary (tr. 1/80-82, 3/154-55).

46. From July to November 2015, MPG West continued communicating with DeCA representatives and warehouse inspectors in Korea and Japan to coordinate warehouse inspections (gov't supp. R4, tabs 1-7).

47. In Korea, MPG West leased a cold storage facility from the Korean government in Anseong, Korea, and it was approved for use prior to the Contract start date (tr. 1/89).

48. In Okinawa, Japan, the Contractor arranged for a new cold storage facility to be constructed, which was approved for use on or about the Contract start date (tr. 1/90, 148).

9

49. In mainland Japan, the Contractor leased a cold storage facility in Yokohama (tr. 1/80).

50. The CO testified that she inquired with MPG West about the timeline to start the contract, and issued the Notice to Proceed based upon input from MPG West (tr. 2/34).

51. On September 14, 2015, the government issued a notice to proceed with a contract start date of November 1, 2015 (R4, tab 3). MPG West signed the notice proceed on the same day (R4, tab 3; tr. 1/70).

52. The CO testified that she assured MPG West that DeCA would bear MPG West's startup costs if DeCA lost the bid protest (tr. 2/36).

53. MPG West submitted an estimate to the CO stating that its cost to start the contract on November 1, 2015 would be "a little more than a million dollars" (tr. 2/36).

54. In September 2015, MPG West began construction of a warehouse in Okinawa to be used for this contract, at a cost of approximately of $2 million (compl. ¶ 59; tr. 1/90).

55. On September 25, 2015, the unsuccessful offeror who challenged the award at the U.S. Government Accountability Office (GAO) filed a pre-filing notice of protest at the United States Court of Federal Claims (R4, tab 5).

56. In October 2015, MPG West began shipments of produce in anticipation of a contract start date of November 1, 2015 (tr. 1/156).

57. Bill Penny, MPG West's President, testified that MPG West encountered difficulties with government officials in Japan that would not work without a firm start date, specifically with respect to inspections required for the importation of produce into Japan (tr. 1/70-74, 142-45).

58. On October 29, 2015, the Court of Federal Claims denied the protest (R4, tab 43b).

59. MPG West received final confirmation that it would begin the contract performance on October 29, 2015, three days before the start date of November 1, 2015 (tr. 1/72-74).

60. An existing warehouse facility located in Yokohama, Japan, which MPG West planned to use, failed several sanitary inspections in early October 2015

(compl. ¶ 60).  As a consequence, MPG West was forced to dispose of produce that was left rotting in containers in the harbor (tr. 1/89).

63.  MPG West also planned to use a newly-constructed warehouse in Okinawa, Japan.  The new warehouse did not pass sanitary inspection until November 4, 2015 (compl. ¶ 58).

62.  MPG West did not request additional start-up time prior to the start of contract performance on November 1, 2015, nor did MPG West bring any problems to the attention of the CO (tr. 2/81-82).

63.  Contract performance began on November 1, 2015.

IV  Contract Performance

A.  The Role of the 106 Vets

64.  The 106 Medical Detachment and Veterinary Service Support (106 Vets) unit, located in Seoul, South Korea, is the command and control unit for all the food inspectors and all the commissaries in the Republic of Korea (tr. 3/157, 191).

65.  The Veterinary Command unit of the Public Health Command District-Japan (Vet Command) located in Camp Zama, Japan, performs the equivalent functions in Japan and Okinawa (tr. 3/157).

66.  The 106 Vets are responsible for food safety inspections, including inspections of incoming produce that is to be delivered to commissaries, facility inspections, and commercial sanitary audits of companies that provide products to the U.S. military, to ensure that their products meet U.S. standards (tr. 3/193-94).

67.  The 106 Vets are required to inspect all inbound food that is going to military installations (tr. 4/24-26).

68.  The 106 Vet inspectors work alongside inspectors from the Korean Ministry of Agriculture's Quality Inspection Agency (QIA) when produce is imported into Korea (tr. 3/146, 158-59; 4/15).  These joint inspections are governed by a Memorandum of Agreement between the United States and Korea, executed by the Joint SOFA Committee (gov't supp. R4, tab 1 at 4004206; tr. 4/36-37).

69.  The U.S. government does not have unilateral authority over this import process.  *Id.*

70. The 106 Vets are responsible for maintaining a list of approved sources based on U.S. practices and standards and to inspect cold storage facilities for use in storing produce that will be sold to the U.S. government (tr. 3/159-60).

71. Locally-sourced FF&V must be purchased from facilities approved by the 106 Vets. The DeCA contracting office must initiate the process for the 106 Vets to audit the local facility. (Tr. 3/160-161)

B. Initial Contract Performance

72. MPG West began shipping products to the Pacific in early October under direction to proceed from DeCA (tr. 1/71-72).

73. Initially, MPG West expressed optimism about its performance (gov't supp. R4, tabs 29, 31).

74. In January 2016, the Appellant sent several representatives to meet with DeCA leadership at DeCA headquarters in Fort Lee, VA to address concerns regarding price, quality, and shipping information (tr. 1/179-181, 2/263, 3/43). During the January 2016 meeting, MPG West assured DeCA senior representatives that it had a plan to reduce prices and improve quality by providing a full offering of locally-sourced FF&V (tr. 1/182-185, 2/259-260, 3/43-44).

75. MPG West confirmed its local sourcing plan in subsequent email communications to DeCA representatives (gov't supp. R4, tab 45; tr. 2/263). In the email communications, MPG West stated that it could source 90 percent of a list of 100 items locally in Korea using a staggered start that would begin in three weeks (gov't supp. R4, tab 45; tr. 2/263).

76. MPG West never implemented the local sourcing plan (tr. 2/260, 264; 3/44-45). Instead, MPG West continued to source most of its produce from the United States and Mexico (tr. 3/44).

77. MPG West sourced produce in the United States and Mexico through its "broker" and sister company, Parma Fruit, also owned by Mr. Penny (tr. 1/ 219-220). MPG West paid brokerage fees to Parma Fruit for items sourced in the United States and Mexico (tr. 1/219-220).

78. By sourcing produce from the United States and Mexico, MPG West incurred the additional cost of transporting the produce to Korea and Japan (tr. 3/44).

C. Status of Forces Agreement (SOFA)

12

79. The United States has a SOFA with Japan and Korea, which sets certain terms and procedures for produce brought into Japan or Korea for consumption by U.S. Military personnel (R4, tab 1 at 19).

80. Both Korea and Japan maintain lists of produce items that are embargoed from entry, but are allowed under the SOFA agreement if the produce is intended for use by the U.S. Military (tr. 3/197-98, 2/124-25).

81. The contract did not require MPG West to import produce under the SOFA (tr. 2/72; app. supp. R4, tab 898 at 2). The contract gave the contractor the discretion whether to import produce items pursuant to SOFA (tr. 2/124-28).

82. In an effort to avoid paying import duties, and to secure a way to import embargoed items, MPG West elected to import some items under a modified SOFA process (tr. 1/117, 2/127-28).

83. Under the terms of SOFA, items imported pursuant to SOFA could not be resold locally (tr. 1/117, 254-56).

84. The import inspection process in Korea added additional time to the import process, introduced additional breaks in the refrigeration cold chain, and required additional in-country transportation; this had the effect of hurting the quality of the produce and raising prices by introducing more costs (tr. 1/118-120, 3/223-24).

85. On October 28, 2015, DeCA wrote a letter to South Korean customs explaining that MPG West was permitted to import embargoed items for sale in the commissaries (gov't supp. R4, tab 27). The CO testified that MPG West's importation difficulties into South Korea ended after she sent the letter (tr. 2/127-32).

D. Prices for FF&V under the Contract

86. During performance, produce items were priced extremely high, including: $2.69 for a single cucumber (tr. 2/225); $8.99/lb. for eggplant (tr. 3/98); $10/lb. for strawberries (tr. 3/31); $7.17/pkg for yellow corn (tr. 3/33); $7.07 for green beans (tr. 3/34); $6.99 for iceberg lettuce (tr. 3/38); and $11.19/lb. for rhubarb (tr. 3/114).

87. Dr. Joseph Jeu, the former Director of DeCA (retired), recalled seeing reports about extremely high prices and testified that "people are very price conscious of some items and we should know that we should never get that kind of pricing, so it is – I was extremely disappointed with [the Appellant]" (tr. 3/38).

88. There was widespread concern about high prices for FF&V at the commissaries throughout Korea, Japan, and Guam (tr. 4/41).

13

89.  At times, MPG West airlifted product to the Pacific at a very high price that it otherwise would have shipped by sea.  This was exacerbated by the need to ensure that the stores had enough quantity to cover the high demand during the Thanksgiving holiday.  (R4, tab 12 at 90; tr. 2/196)

90.  MPG West elected not to alter its profit margins on individual items, as is common in the grocery business, instead charging the same profit on each item (tr. 1/245-46).

E.  Weekly Price Review Process

91.  The government would monitor prices provided on the weekly price lists for being fair and reasonable considering the market conditions at the time (R4, tab 1 at 10).

92.  The DeCA produce category manager had the authority to make a determination of fair and reasonable price (tr. 3/135).  The DeCA produce category manager and her team reviewed proposed prices weekly before the prices were fixed and published to the stores (tr. 3/102, 107).  The DeCA produce category manager during the relevant time was Bridget Bennet (tr. 3/62).

93.  DeCA personnel working at the store level did not have authority to make a determination of fair and reasonable price (tr. 3/135-136).

94.  In its weekly price reviews, DeCA utilized a comprehensive analysis to determine whether the proposed prices were fair and reasonable; considerations cited by the produce category manager included trend analysis, suggested retail cost over $5.00 per unit, week-to-week price increases over 20 percent, and promotional status of an item (tr. 3/120-27).

95.  For items on the weekly price list that appeared to be priced unreasonably high, DeCA requested explanatory information (tr. 3/119-120).

96.  If an item was finally determined to be unreasonably priced, Ms. Bennet and/or a member of her team requested the item be removed from the ordering guide or offered at a lower price (tr. 3/86, 91).

97.  DeCA and MPG West negotiated the final fixed price of items on a weekly basis (tr. 1/98-99; 3/108-109).  MPG West provided the government with a weekly catalog of items, with the prices established based on its costs and overhead (tr. 1/90-91).

98.  DeCA held a weekly conference call with MPG West to review the pricing of the items listed on MPG West's weekly catalog (tr. 1/98-99, 3/99-100).

99.  The weekly conference call was held in advance of when MPG West would need to purchase and ship the items (tr. 3/100).

100.  During these calls, DeCA would ask MPG West to offer certain products at lower prices (tr. 1/97-99, 177-179).

101.  During the weekly meetings, DeCA sometimes asked appellant to remove products, including products on the HVCI list and bagged salad, from the commissary catalogs due to the price (tr. 1/177-179; app. supp. R4, tab 57 at 96; R4, tabs 851, 867-868).

102.  DeCA recommended that its employees monitor prices and, if the prices were too high, remove the high-priced items from the catalog (tr. 3/93; app. supp. R4, tabs 849, 868).

103.  In determining whether the price of a particular item was reasonable, DeCA considered whether the price of a particular item was higher than $5.00 and whether the price of a particular item was greater than 20 percent higher than the previous week (tr. 3/100).

104.  If DeCA determined that a price for a certain item was "unreasonable," it would direct MPG West either to reduce the price or remove the item from the weekly catalog (tr. 3/91, 98).

105.  DeCA made the majority of its pricing directions orally during the weekly conference calls, and sometimes reduced them to writing via email (tr. 1/100).

106.  Bridget Bennett, the DeCA Produce Category Manager, testified that DeCA typically would question ten or so items out of a catalog of 400 offerings.  On a weekly basis, DeCA approved the vast majority of the items submitted by MPG West (tr. 3/111).

107.  DeCA did not independently analyze the contractor's profit or overhead when performing the weekly price analysis meetings (tr. 3/102-03).

108.  Throughout the course of performance, DeCA was concerned about mitigating the complaints of its patrons with regard to the prices at the commissaries (R4, tab 44b at 4006-09).

109.  DeCA monitored social media sites including Twitter and Facebook for patron complaints, and considered those complaints when directing MPG West to reduce its prices or remove items from the catalog (tr. 3/104).

15

110.  In some situations, MPG West acknowledged and corrected pricing errors or explained that the local growing season was ending (app. supp. R4, tabs 855, 858).

111.  In other situations, however, MPG West tersely responded that the price was the "new retail price" or due to a "FOB increase" (app. supp. R4, tabs 852, 855).

F.  The Bagged Salad Requirement

112.  The contract required MPG West to supply bagged salad products from a list of approved sources (R4, tab 1 at 7).

113.  The list of approved sources was set forth on Attachment 12, which provides a web link to a list of approved sources (R4, tab 1 at 61).  The contract contained an Attachment 11, which listed Fresh Express as the sole source of bagged salads (R4, tab 1 at 60).  Attachment 11 was not a part of the solicitation (tr. 2/70).  The solicitation requested offerors to identify the brand name of their salad supplier, and MPG West identified Fresh Express as its supplier (tr. 2/60, 69-71).

114.  MPG West shipped Fresh Express bagged salads via the same airfreight and stored them in the same cold storage facilities as all the other perishable products under the contract (app. supp. R4, tab 231).

115.  During the course of performance, MPG West told DeCA that it was having trouble with the bagged salad requirement and requested assistance because it was losing so much money on these products (R4, tab 12 at 88-89; tr. 2/55-59).

116.  Bagged salads were not listed as HVCI and were not subject to the patron savings requirement (tr. 2/110).

117.  MPG West approached DeCA and asked if DeCA could take over the bagged salad program (tr. 2/55-56).

118.  DeCA Director Joseph Jeu testified that DeCA agreed to remove bagged salads from the contracts and reinstate second destination transportation for bagged salads to the Pacific (tr. 3/51).

119.  On July 12, 2017, DeCA issued bilateral Contract Modification No. P00003 removing the bagged salad requirement from the Contract without further compensation under the Changes clause of the contract (FAR 52.212-4(c)) (app. supp. R4, tab 49).  There was no mention of the termination for convenience provision of the contract.

16

120. In total, MPG West asserts that it spent $5,089,321.56 more on providing the bagged salad products than it was paid by DeCA (app. supp. R4, tabs 799-800).

V. The Inspector General Reports

A. The Guam Report

121. On February 28, 2017, the Department of Defense Inspector General (IG) issued Report No. DODIG-2017-060 titled "Defense Commissary Agency Purchases of Fresh Produce in Guam" (Guam report) (app. supp. R4, tab 48).

122. The Guam report presented findings regarding the "current local purchase process contract for fresh produce in Guam" (app. supp. R4, tab 48 at i).

123. Anthony Peters, an IG employee, testified at the hearing (tr. 4/52-101). He served as the program manager that oversaw the audit for the Guam report (tr. 4/58, 60).

124. Mr. Peters testified that the Guam report provided a recommendation that "was specific to only Guam" and did not evaluate any information or data generated in South Korea or Japan (tr. 4/74, 100).

125. Mr. Peters testified that the results of the Guam report could not be extrapolated to other countries (tr. 4/100).

B. The Oversight Report

126. On February 22, 2018, the IG published Report No. DoDIG-2018-078 titled "Defense Commissary Agency Oversight of Fresh Produce Contracts in Japan and South Korea" (oversight report) (app. supp. R4, tab 979).

127. The oversight report was based on an audit conducted from March through December 2017, and relied upon a sample of data from November 2, 2015 to May 23, 2017 (app. supp. R4, tab 979 at 20-21).

128. Mr. Peters conducted the audit for the oversight report (tr. 4/60). He testified that the audit for the oversight report "included more than just an MPG West contract" (tr. 4/79). The audit included multiple contractors, including MPG West, EKK Investments, and Interharvest (tr. 4/80).

129. The oversight report published findings relating to DeCA's internal policies and procedures for conducting market basket surveys, produce inspection worksheet credit calculations, and fill rate calculations (app. supp. R4, tab 979 at i).

17

130. The oversight report contains an Agency response which states that DeCA reviewed produce inspection worksheets from November 2015 to February 2016, and determined that the net impact of calculation errors was $1,545, or only 0.015 percent of the $9.9 million payments reviewed (app. supp. R4, tab 979 at iii).

131. The IG performed its own fill rate calculations based on data generated during MPG West's performance of the contract in November 2015 and January 2016 (app. supp. R4, tab 979 at 12).

132. The IG fill rate calculations for MPG West were 66 percent (vice 72 percent calculated by DeCA) and 78 percent (vice 69 percent calculated by DeCA) (app. supp. R4, tab 979 at 12).

133. The IG fill rate calculations resulted in fill rate percentages that were still well below the contract requirement of 98 percent (tr. 4/98).

134. Petra Pulze, the CO, testified that the fill rate is calculated based on items ordered by the commissaries versus items actually received (tr. 2/67). As a result, items that are unavailable on the market would not lower the fill rate, because unavailable items should not appear in the ordering catalog (tr. 2/67-68).

135. The CO testified that MPG West "very seldom" met the required contractual fill rate of 98 percent (tr. 2/68).

C. The Market Research Report

136. On February 12, 2018, the IG published Report No. DODIG-2018-072 titled "Defense Commissary Agency's Purchases of Fresh Produce for Japan and South Korea" (market research report) (app. supp. R4, tab 978).

137. The IG conducted its audit of DeCA's market research from March 2017 to December 2017 (app. supp. R4, tab 978 at 16).

138. The market research report concluded that prices in South Korea and Japan increased because DeCA's market research was inadequate (app. supp. R4, tab 978 at ii).

139. DeCA disagreed with the report's finding regarding market research (app. supp. R4, tab 978 at 28).

140. Robert Shonewolf, the project manager for the market research report, testified at the hearing (tr. 4/128-152).

141. He testified that his audit team "[wasn't] looking at the [MPG West] contract per se. We were just looking at the prices prior to [the contract] and what they were at the time we were looking at the audit. We didn't dig into the contract." (Tr. 4/146)

142. He further testified that the audit did not study the impact of the contract on MPG West, did not evaluate DeCA's conduct of weekly price reviews, and did not evaluate the startup process nor MPG West's delivery of bagged salads (tr. 4/147-48). Moreover, the audit did not segregate data between MPG West and other contractors that were also performing contracts in South Korea and Japan (tr. 4/148).

VI. Request for Equitable Adjustment and Subsequent Claims

143. On March 6, 2016, MPG West submitted a Request for Equitable Adjustment (REA) to the contract in the amount of $3.3 million (R4, tab 7).

144. On March 7, 2016, at MPG West's request, DeCA began paying MPG West's invoices on a daily basis, as opposed to the normal weekly payment cycle (R4, tab 9).

145. On March 9, 2016, DeCA requested that MPG West answer several questions and provide documentation supporting its REA (R4, tab 10).

146. On March 10, 2016, during a teleconference, MPG West requested an immediate advance payment of $2.8 million on its claim. In the teleconference, MPG West described anticipated shipment delays, inspection problems, extended timeline to clear facilities for storage, low produce fill rates, and MPG West's financial problems associated with paying vendors and securing adequate credit. This discussion was memorialized in an email. (R4, tab 11)

147. On March 22, 2016, MPG West withdrew its request for equitable adjustment and submitted a certified claim requesting payment for $5,076,339.52 (R4, tab 13). The claim narrative refers to the bagged salad requirement as causing increased transportation costs and loss of produce during the import process. The claim attributes the difficulties to DeCA's failure to facilitate immediate customs clearance of embargoed items, leading to the loss of perishable product, such as "many green/lettuce items including . . . bagged salads." The claim itemizes losses attributable to produce lost as perishable allegedly due, in part, to "intra-government disputes concerning inspections of produce and warehouse inspections/licensing." (R4, tab 13 at 4) It further references the specific dollar amounts sought in that claim as including costs paid to Fresh Express, the vendor associated with the bagged salad requirement (R4, tab 13b at 115-18), as well costs associated with the disposal of specific salad items (R4, tab 13a at 100).

19

148. On March 28, 2017, the government requested supporting documentation for the claim (R4, tab 14).

149. On April 26, 2016, MPG West provided DeCA with claim documents and backup data (R4, tabs 17-18).

150. On May 4, 2016, the government requested that MPG West provide information in a different format, and included a suggested format for presentation of the supporting documentation (R4, tabs 22, 22a).

151. That same day, MPG West stated that it must receive an interim payment within seven days or it would have to phase down performance (R4, tab 23).

152. On May 9, 2016, MPG West told the government that it needed $1.7 million in the "next few days" in order to avert a phase down in performance (R4, tab 26 at 2).

153. On May 11, 2016, MPG West requested that the government consider issuing a loan to it secured by collateral (R4, tab 28).

154. On May 12, 2016, the government made a $2 million partial payment of the claim to MPG West, based on the guarantee that MPG West would submit documentation that would allow the government to validate the payment and any additional payments that may be due (R4, tab 30).

155. MPG West paid the $2 million in full on May 17-18, 2016 to its subcontractor, Interharvest, in order to keep the contract afloat (R4, tab 43i at 3757).

156. On June 8, 2016, the government issued a cure notice to MPG West for failing to meet the contract requirements regarding fill rates and timely submission of market-basket surveys (R4, tab 32).

157. In July 2016, two subcontractors (EKK Investments and Interharvest Japan) effectively took over all of the cost and performance of the contract (tr. 2/245).

158. DeCA coordinated with MPG West to set up an escrow account to receive and distribute government contract payments directly to the subcontractors (gov't supp. R4, tab 36).

159. On October 6, 2016, MPG West submitted its first supplemental claim to the Government and revised the claim amount to $11,459,279 (R4, tab 39).

160. On November 13, 2016, MPG West submitted a second supplemental claim to the government with a revised claim amount of $10,952,546 (R4, tab 43). The

revised claim amount of $10,952,546 set forth in the second supplemental claim was comprised of the following figures:

| $6,380,837 | Cash Reserves Spent on Increased Costs |
|---|---|
| $625,000 | Payment to Interharvest from Sale of Personal Residence |
| $2,922,620 | Current Vendor Arrearages |
| $324,089 | Fresh Express Judgment |
| $700,000 | Unrealized Profit |

(R4, tab 43 at 17)

161. The $6,380,837 "Cash Reserves Spent on Increased Costs" was calculated as the total expenses MPG West incurred from October 2015 - February 2016, minus the amounts paid on the contract (R4, tab 43 at 13).

162. The CO testified that she had not seen anything that broke out the bagged salad costs separately from all other produce when reviewing the claim (tr. 2/99). She further testified that she had not been provided the documents now labeled as App. Supp. Rule 4, Tabs 799 and 800, which consist of bagged salad costs only, when she reviewed the claim (tr. 2/99-100).

163. On January 3, 2017, the government issued a COFD to appellant wherein the CO provided her analysis for each element of the claim (R4, tab 47).

164. The COFD stated:

> I have previously determined that MPG was entitled to increased compensation because of the compressed start-up period and difficulties MPG encountered in getting its product through the inspection process in the countries. In the interest of good faith and fair dealing, on May 13, 2016, DeCA paid MPG a sum of $2,000,000.00 even though such costs were not fully definitized, as explained in our May 12, 2016 letter.

(R4, tab 47 at 4)

165. The COFD determined that no other costs were supported by the appellant (R4, tab 47 at 4).

166. During the hearing, when the Contracting Officer was questioned whether, when she issued her final decision, she included in her considerations a payment of or

21

request for payment of $5,089,321.56 for bagged salad costs, she testified:  "No.  Not at all."  (Tr. 2/105)

VII.  Novation of the Contract and Litigation before the Board

167.  On February 24, 2017, the appellant novated the Korea portion of the contract, CLIN 001, to EKK Investments (app. supp. R4, tab 989).  As part of the novation agreement between MPG West.  EEK Investments, and the government for CLIN 001, MPG West waived any future claims not already filed with the government (app. supp. R4, tab 989 at 2).

168.  On April 14, 2017, MPG West filed its complaint under ASBCA No. 61100 alleging three counts:  Count One – Constructive Contract Changes; Count Two – Breach of Contract; and Count Three – Constructive Change/Termination for Convenience.  Counts Two and Three were presented as alternative theories of recovery.

169.  On April 19, 2017, the removal of the requirement to deliver bagged salads to Japan became effective (compl. ¶ 138; gov't answer ¶ 137).

170.  On September 12, 2017, MPG West novated the Japan portion of the contract, CLIN 002, to Interharvest Japan Co., Ltd. (app. supp. R4, tab 990).  As part of the novation agreement for CLIN 002, appellant further waived any future claims not already filed with the government (app. supp. R4, tab 990 at 2).

171.  On January 10, 2018, the government filed a Partial Motion to Dismiss for Lack of Jurisdiction pertaining to the third count of appellant's appeal seeking $5,089,321.56 as compensation for bagged salad costs (gov't mot., dtd. Jan. 1, 2018).

172.  The next day, January 11, 2018, appellant filed what the Board deems a protective claim with DeCA referred to as a "third supplement" to its claim seeking $5,089,321.56 as compensation due to constructive changes while delivering bagged salads.  The supplemental/protective claim did not increase the originally claimed amount, however it was submitted to "further explain the bagged salad portion of MPG West's existing claim" as well as include conclusions from the IG report.

173.  On January 24, 2018, appellant filed another protective claim with DeCA referred to as a "fourth supplement" to its claim seeking $5,089,321.56 as compensation due to constructive changes while delivering bagged salads alleging that the removal of the bagged salad requirement under Modification No. P00003 equated to a termination for convenience (gov't supp. R4, tab 40).

174.  On March 12, 2018, the government issued a COFD denying appellant's third supplemental claim on the basis that it was untimely (gov't. supp. R4, tab 41).  On March

22

27, 2018, the government issued a COFD denying appellant's fourth supplemental claim on the basis that it was untimely (gov't supp. R4, tab 42). The CO testified that the third and fourth supplemental claims were untimely because appellant already had novated the contract (tr. 2/105).

175. Appellant appealed the denial of its third and fourth supplemental claims to the Board.

176. The Board assigned the new protective appeals ASBCA Nos. 61560 and 61570 respectively. Upon motion by appellant that the new appeals involved alternative legal theories for recovery of the amount claimed in ASBCA No. 61100, and over the government's objection, the Board consolidated them with ASBCA No. 61100 (Board Order dtd. April 4, 2018).

177. Additionally, the Board deferred a ruling on the Government's jurisdictional arguments regarding the portion of the protective appeals pertaining to bagged salad costs of $5,089,321.56 (Board Order dtd. April 4, 2018).

178. On March 22, 2018, the Appellant amended its complaint to remove $683,797.60 in claimed costs, along with sixteen exhibits, that were admitted during depositions to have been incurred on a different contract (amend. compl. dtd. Mar. 22, 2018).

179. The amended complaint changed the total amount claimed from $9,474,359.71 to $9,489,385.10, thereby increasing the total claim amount. (amend. compl. at 2).

180. The Board held a three-day hearing for theses appeals on May 15-18, 2018.

DECISION

I. Whether the Board Possesses Jurisdiction to Entertain Count Three of ASBCA Nos. 61100, 61560, and 61570

DeCA contends that the Board lacks jurisdiction to entertain Count Three of MPG West's complaint, which seeks to recover $5,089,321 in costs associated with the bagged salad delivery requirement (gov't br. at 32-34; compl. at 37-38). According to DeCA, the third count MPG West's complaint is not a proper claim, because the events that gave rise to MPG West's claim occurred *after* the CO issued her final decision denying MPG West's initial claims (gov't br. at 33). The CO testified that she did not consider MPG West's request for payment of $5,089,321 when she issued her final decision (findings 162, 166) and, as a result, she did not receive adequate notice of the

basis and amount of the claim. *See Fahim Noori Constr. Co.*, ASBCA No. 60659, 16-1 BCA ¶ 36,492 at 177,833.

After the government moved to dismiss Count Three, MPG West filed two new claims with the CO, one for bagged salad costs on a theory of constructive change, and one for the same costs based on the government's termination of the requirement (findings 172-173). The CO denied these claims as untimely on the grounds that they were filed after appellant had novated the contract (finding 174). According to the DeCA, the novation agreement included a waiver of its rights to pursue future claims (gov't br. at 34).

Because MPG West filed protective appeals relating to each of its new claims for bagged salad costs (findings 172-173), we need not decide whether we possess jurisdiction over Count Three, because we now have appeals from COFDs for claims presented to the CO, thereby establishing jurisdiction. 41 U.S.C.A. § 7104. Because we are denying the appeals in their entirety, there is no need to address whether the merits of these appeals may affect quantum and the running of interest. Consequently, we possess jurisdiction to entertain Count Three of MPG West's amended complaint.

## II. Whether DeCA Breached its Duties under the Terms of the Requirements Contract

In support of its claim of entitlement, MPG West contends that the contract is a requirements contract and that DeCA has a duty to exercise good faith and reasonable care in estimating both the amount of goods it would need in the solicitation, and in determining its requirements during the course of performance (app. br. at 29). According to MPG West, DeCA breached these duties both by demanding that MPG West offer lower prices on FF&V, and by preventing MPG West from selling products that it had purchased and shipped to Japan and Korea at its own expense (app. br. at 26).

### A. Whether DeCA's Quantity Estimates Were Negligently Prepared

The government is not required to be clairvoyant when it issues an estimate for bidding purposes, but a contractor can recover if it shows that the estimate was inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made. *Burnham Associates, Inc.*, ASBCA No. 60780, 18-1 BCA ¶ 36,934 at 179,942 (citing *Clearwater Forest Industries, Inc. v. United States*, 650 F.2d 386, 395 (Ct. Cl. 1981)). Thus, to the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or not, amounts to a breach of contract. *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1335 (Fed. Cir. 2003) (citing *Womack v. United States*, 389 F.2d 793, 800 (Ct. Cl. 1968)). Even if the government's estimate is not drastically inaccurate, if it was prepared negligently or in bad faith the government is liable for breach. *American*

24

*General Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,635. The critical measure for determining whether an estimate was negligently prepared is whether the estimate is based upon all relevant information that is reasonably available to the government at the time of award. *Burnham,* 18-1 BCA ¶ 36,934 at 179,943 (citing *Womack*, 389 F.2d at 801).

In this appeal, MPG West contends that the contract was flawed from its inception, because of the "incompatibility of the import obligations, the pricing requirements including all costs such as freight, and the government's attempt to keep patron prices as low as possible." (App. br. at 32) MPG West points to the DOD Inspector General's report as evidence that DeCA was aware of these flaws, but nonetheless refused to acknowledge that the flaws caused MPG West to incur substantial damages (app. br. at 14-16).

The solicitation included weekly estimated quantities by pound for each item on the HVCI list for each CLIN, based on the previous three years of consumption data under the incumbent contract (finding 12). MPG West contends that the weekly estimates were flawed, because they did not account for all of the items on the HVCI list that are subject to embargo in Japan and Korea and failed to include estimates for non-HVCI items or for the bagged salad products (app. br. at 31). MPG West neglects to explain, however, how these estimates contributed to the problems MPG West encountered during performance.

MPG West's allegations concerning DeCA's estimates of HVCI are a red herring. Items that are unavailable on the market would not lower the fill rates, because they would not appear in the ordering catalog. Indeed, the contract required appellant to supply an item subject to the market basket survey only "if it's available." (Finding 22) Therefore, any errors in estimating the local availability of HVCI would not impact MPG West's ability to satisfy the 98 percent fill rate requirement.

MPG West also blames DeCA for failing to "understand the amount of produce that would need to be imported to meet DeCA's requirements" (app. br. at 32). It faults DeCA for failing to "understand the difficulty of importing produce into Japan and Korea, the effect of customs clearance on the quality of produce, and the impact all of this would have on patron prices" (*id*.).

In our view, MPG West's quarrel is not with DeCA's weekly estimated quantities, but with the fact that MPG West was unable to obtain local sources of produce and was forced to import significant quantities of produce to fill DeCA's requirements. The record demonstrates that MPG West failed to timely implement a local sourcing plan. As a result, MPG West sourced most of its produce from overseas (finding 76). For imported produce, MPG West paid brokerage fees to its sister

25

company, Parma Fruit (also owned by Mr. Penny) (finding 77), and it incurred extra costs of transporting the produce to Korea and Japan (finding 78).

MPG West has not provided specific evidence that DeCA was negligent in estimating weekly produce quantities. Instead, appellant seeks to rely upon the COFC's bid protest findings and the DOD IG's reports as evidence that DeCA was negligent in preparing quantity estimates (gov't br. at 52). As we discuss more fully below, in Section II.B., we do not consider the DOD IG's reports to be dispositive. Indeed, appellant admits that the COFC held that DeCA's market research was adequate and complied with FAR 10.001(a)(3)(1) (app. br. at 34).

B. Whether the IG Reports are Persuasive Evidence of Breach

As we concluded at the hearing, each of the IG reports are admissible into evidence (tr. 3/49-50) pursuant to the public records exception to the hearsay rule. Fed. R. Evid. 803(8); *Tab Constr.*, ASBCA No. 48324, 95-2 BCA ¶ 27,788 at 138,593 (allowing admission of Air Force memoranda pursuant to official record exception to the hearsay rule).

MPG West asserts that the IG's findings establish the following facts:

- That DeCA failed to perform adequate market research into the local availability of FF&V (app. reply at 4).

- DeCA failed to consider the difficulty of transporting produce into Korea and Japan, and its impact on produce prices and quality when awarding the contract (app. reply at 1, 5).

According to MPG West, these facts support its claim that DeCA breached its duties under the requirements contract, as well as its duty to cooperate in contract performance (app. reply br. at 5). MPG West asks that we take judicial notice of the reports and accord them significant weight (app. reply br. at 1, 4).

In response, DeCA contends that the IG reports did not analyze the issues raised in MPG West's claim. It further responds that the IG reports are not legally binding as party admissions. For a variety of reasons, we do not find the IG reports dispositive of MPG West's claims of breach.

First, the Guam report, dated February 28, 2017, was specific only to Guam and did not address South Korea or Japan (finding 122). According to the Program Manager who oversaw the report, its findings cannot be extrapolated to other countries (finding 125).

Second, with respect to the oversight report, dated February 22, 2018, it involved an audit that included data from all three contractors and did not differentiate between

26

data from MPG West's performance of the contract (finding 127). The only portions of the oversight report potentially relevant to MPG West's claim are the report's findings regarding DeCA's calculation of fill rates and credits for produce inspection worksheets (finding 129).

Accepting as true the report's findings that DeCA incorrectly calculated fill rates, the corrected calculations do not change DeCA's overall conclusion that MPG West routinely failed to meet the 98 percent fill rate requirement. As the CO testified, MPG West "very seldom" met the fill rate requirement (finding 135). This is true even when considering that items unavailable on the local market were not counted against the fill rate, because the fill rate was based on orders versus receipts (finding 134).

The market research report, dated February 12, 2018, addressed DeCA's market research (finding 136). The report did not segregate data generated during MPG West's performance from data generated after other contractors took over in July 2016 (finding 137). The report also did not address DeCA's weekly price reviews, nor its delivery of bagged salads (finding 142).

Relying on the market research report, MPG West contends that "DeCA failed to consider the fact that in South Korea and Japan, the contractor would only have one customer – DeCA – whereas the contractors in Europe and Guam had other avenues for sales" (app. br. at 14; app. supp. R4, tab 978 at 12). Accepting this conclusion as true, we do not consider it dispositive. The contract was not a SOFA contract and placed no restrictions on MPG West's ability to sell to other customers (finding 81). To the extent that MPG West imported produce under SOFA to avoid import duties, it did so on its own volition and knowingly accepted the concomitant restrictions on the resale of imported produce (finding 82).

Next, MPG West contends that DeCA failed to account for the "difficulty of transporting produce into Japan and South Korea and its impact on produce prices when awarding the contract" (app. br. at 15; app. supp. R4, tab 978 at 13). As we discuss in much greater detail below in Section IV, the contract placed the sole responsibility for importation on MPG West. Although there were problems initially with the importation process and confusion surrounding the SOFA process, the problems largely were alleviated when the CO wrote to Korean officials and explained that MPG West was permitted to import produce under SOFA (finding 85).

Moreover, assuming that the IG report correctly concluded that DeCA failed to understand the custom clearance process and the adverse effect it would have on produce prices, we fail to see how DeCA's "understanding" is tantamount to a breach of the contract. Even if we accept that DeCA's procurement strategy was flawed, MPG West responded to the proposal and agreed to the terms of the contract as proposed.

C.  Whether DeCA Breached the Terms of the Requirements Contract during Performance

MPG West argues that DeCA breached the contract during performance in three ways.  First, MPG West argues that DeCA based its weekly produce orders on political concerns about how patrons perceived prices, rather than on the commissaries' actual requirements (app. br. 37-38).  Second, MPG West argues that DeCA implemented new pricing factors that were not included in the contract (app. br. at 39-41).  Finally, MPG West contends that DeCA failed to provide effective contract oversight and training to government employees involved in the ordering and produce importation process (app. br. at 36-37).

The Federal Circuit has recognized that in a requirements contract, the limit on the government's freedom to determine its requirements is its duty to act in good faith. *See Technical Assistance Intern., Inc. v. United States*, 150 F.3d 1369 (1998) (discussing balance between ordering flexibility and duty to act in good faith).  In that case, good faith meant that "[the] buyer . . . has a valid business reason for varying its requirements other than dissatisfaction with the contract."  *Id*. at 1372.

DeCA does not dispute that the contract was a requirements contract, but contends that the contract provided considerable flexibility in ordering.  In particular, DeCA points out that the contract gave the government the flexibility to order produce from other providers, as long as the contract with MPG West was the "primary source." (Gov't br. at 48).

The contract contained FAR 52.216-21, REQUIREMENTS, and FAR 52.216-19, ORDERING LIMITATIONS.  Together, these clauses provide that DeCA must meet the minimum ordering limitations set forth in the contract, but otherwise is not obligated to order the estimated quantities.  FAR 52.16-21(a) provides that the failure to order estimated quantities set forth in the contract "shall not constitute the basis for an equitable adjustment."  FAR 52.16-19(a), in turn, provides that orders must satisfy the minimum ordering limitations set forth in the contract.  (Finding 21)

These clauses must be read in conjunction with the statement of requirements.  As FAR 52.216-21(c) allows, the parties may agree to a more specific statement of requirements allowing the government to purchase from other sources.

> *Except as this contract otherwise provides*, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

28

FAR 52.216-21(c) (emphasis added). Here, the contract's statement of requirements provided that DeCA "will contract with one or more sources to provide [produce] to various DeCA Commissary stores in South Korea, and Japan," and "[t]his contract is the primary source of [produce]" (finding 21). Thus, the contract gives DeCA limited freedom to order FF&V from other sources provided that MPG West remains the primary source.

Against this contractual backdrop, we turn to whether DeCA breached its contractual obligations when conducting its weekly review of MPG West's produce catalog. In particular, we must determine whether the government's request to remove an item from the catalog or request that MPG offer an item at a lower price violated the terms of the contract.

As discussed more fully below, we conclude that DeCA conducted the weekly pricing review in a manner that was reasonable and consistent with the contract terms (*see* Section III.B.3). DeCA developed and applied reasonable and consistent criteria to evaluate weekly prices based on the past history of prices for particular items (finding 103). DeCA approved the vast majority of the items submitted by MPG West on a weekly basis (finding 106). For those items that it questioned, DeCA identified *why* it was questioning the price and gave MPG West an opportunity to explain the price (findings 103-104).

We are convinced that MPG West's financial losses resulted predominantly from factors within its control, rather than from government conduct. The record demonstrates that MPG West failed to timely implement a local sourcing plan. As a result, MPG West sourced most of its produce from overseas (finding 76). For imported produce, MPG West paid brokerage fees to its sister company, Parma Fruit (also owned by Mr. Penny) (finding 77), and it incurred extra costs of transporting the produce to Korea and Japan (finding 78). Finally, the record contains no evidence that the government interfered with MPG West's performance of the contract.

A contractor cannot prevail on a breach claim when it underestimated the difficulty of the anticipated contract work. *RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 775 (2017). Indeed, it is well settled that "the risk of increased performance costs in a firm-fixed-price contract, absent a clause stating otherwise, are on the contractor." *Edinburgh International*, ASBCA No. 58864, 16-1 BCA ¶ 36,227 at 176,744 (quoting *Chevron U.S.A., Inc.*, ASBCA No. 32323, 90-1 BCA ¶ 22,602 at 113,426); *see also United States v. Spearin*, 248 U.S. 132, 136 (1918) ("Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered."). In this appeal, MPG West accepted the risk of increased performance costs when it elected to import the majority of the produce necessary to fulfill the contract's requirements.

29

III.  Whether DeCA Constructively Changed the Terms of the Contract

As an alternative to its claim of breach, MPG West contends that DeCA constructively changed the terms of the contract in three fundamental ways:  (1) by failing to provide adequate time for the startup of the contract; (2) by pressuring MPG West to reduce its prices and preventing it from recouping its actual costs; and (3) by failing to cooperate with MPG West in complying with host nation laws concerning the import of fresh produce (app. br. at 43-47).

In order to prevail on a theory of constructive change, MPG West must demonstrate that:  (1) the CO or her delegate compelled performance of work beyond the contact terms; (2) the change was directed by someone with contractual authority unilaterally to alter the contractor's duties; (3) the contractor's performance requirements were enlarged; and (4) the added work was not volunteered.  *Innoventor, Inc.*, ASBCA No. 59903, 17-1 BCA ¶ 36,798 at 179,355.  Appellant bears the burden of proving the elements of a change.  *Die-Matic Tool Co.*, ASBCA No. 31185, 89-1 BCA ¶ 21,342 at 107,603, *aff'd*, 889 F.2d 1100 (Fed. Cir. 1989) (table).

### A.  Whether Constructive Change Doctrine Applies to a Commercial Items Contract

As a threshold argument, the government contends that the constructive change doctrine does not apply to this commercial items contract (gov't br. at 37).  Because the contract contains FAR 52.212-4 (c), which provides that changes only may be made by written agreement of the parties, the government had no unilateral authority to order work beyond the contract terms *(id.)*.  Thus, according to the government, the second element of the doctrine of constructive change – contractual authority to unilaterally alter the contractor's duties – cannot be satisfied here *(id.* at 37).

MPG West has not cited a decision of this Board applying the constructive change doctrine to a commercial items contract, nor have we directly addressed the issue. *Tkacz Engineering, LLC*, ASBCA No. 60358, 18-1 BCA ¶ 36,940 at 179,962 (citing *Hawaii CyberSpace*, ASBCA No. 54065, 04-2 BCA ¶ 32,744 at 161,946 n.1 (declining to decide whether the constructive change doctrine applies to commercial items contract); *but cf. Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1385-86 (remanding to the Board initial consideration of a constructive change claim made with respect to a Commercial Items contract).

In this appeal, regardless of whether we analyze MPG West's arguments through the lens of constructive change or breach, our primary focus is on whether the work MPG West performed was within the scope of the contract, and whether it performed that work voluntarily.

30

B.  Whether DeCA Constructively Changed the Terms of the Contract

The starting point for our analysis of constructive change is the language of the contract.  "In order to decide whether a constructive change has occurred, we examine the pertinent contract language . . . to interpret the contract requirements." *Lamb Eng'g & Constr. Co.*, ASBCA No. 53304 *et al.*, 06-1 BCA ¶ 33,178 at 164,417.  Where the provisions of a contract are "clear and unambiguous, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*) (citations omitted).

1.  Whether the Lack of Time Provided for Startup Constituted a Constructive Change

Appellant contends that DeCA did not give it enough time to prepare for performance and to establish local sources of produce to supply the commissaries (app. br. at 48-52).  Due to bid protests by the incumbent contractor, MPG West did not receive final confirmation that it had the contract until three days before the start date (finding 59).  According to MPG West, the government's direction to proceed without enough time to secure local sources, in-country personnel, and necessary logistics was a compensable change to the method and manner of performance (app. br. at 52).

In response, the government admits that the time for startup was compressed due to bid protests by the incumbent contractor (gov't br. at 38).  Indeed, in the COFD, the government compensated MPG West in the amount of $2 million for the compressed start-up period and the difficulties MPG West encountered in getting its product through the inspection process (finding 154).  However, despite the delay from the bid protests, the government maintains that MPG West's contemporaneous communications reveal no concerns about financial losses during startup (gov't br. at 39-40).

The contract did not include a transition period for the startup of the contract.  In the absence of a transition period, the contractor is expected to perform on the date identified upon contract award.  *CWT Alexander Travel, Ltd. v. United States*, 78 Fed. Cl. 486, 495 (2007).  In the absence of a contract term establishing a specific start date or period for transition, we will not imply a term.  *Id.*; *see also Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (holding that contracting party cannot invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting).

The timeline reveals uncertainty regarding whether MPG West would have the contract until three days before the November 1, 2015 start date (finding 59).  However,

MPG West admits that it began preparations for the contract as early as May 22, 2015, when it was awarded the contract (app. br. at 48; finding 41). MPG West hired personnel, contracted with local trucking companies, and took steps to secure cold storage in Korea and Japan (app. br. at 48). Moreover, DeCA issued a notice to proceed on September 11 and followed it up with further direction on September 22 to prepare for a November 1, 2015 start date. Despite an intervening bid protest at the Court of Federal Claims which was not resolved until October 29, 2015, MPG West continued its efforts to secure personnel and logistics subcontractors for the new start date (app. br. at 49).

Although MPG West asserts that it encountered difficulties with subcontractors and government officials in Korea and Japan because of the uncertainty surrounding the second bid protest, DeCA stated that it would pay for losses associated with shipping produce from overseas to be ready for the November 1, 2015 start date (finding 52).

While it is true that the contract did not require MPG West to locally procure FF&V, MPG West knew from time of the solicitation that it would need to "locally source as much FF&V as possible from the local market, which would include locally available imported items" (finding 10). From the beginning, MPG West was on notice that locally sourcing produce was crucial to successfully performing the contract. Indeed, former Director Jeu expressed disappointment that MPG West was slow to go to local sourcing (app. br. at 51).

According to MPG West, it takes 3-4 months to establish a source for local produce. Citing an email written by Mr. Dieter, DeCA's Deputy Director of Acquisition Management, MPG West claims that the uncertainty about the start date did not give it sufficient time to establish local sources of produce (app. br. at 115). According to MPG West's owner, Mr. Penny, local companies would not agree to contracts without a firm start date. However, his hearing testimony specifically addresses difficulties with Plant Quarantine Japan regarding the importation of produce into Japan – not difficulties with securing local growers or other local sources of produce (finding 57).

Instead, MPG West offers only an unsupported allegation that it did not have enough time to establish contracts with local growers, and vague statements about local growers not growing in excess of their contracts and the expense of procuring local produce that is not grown on contract (app. br. at 115). MPG West provides no detail in the record about the efforts it undertook to establish contracts with local growers, nor does it explain how the government prevented it from doing so.

Instead, the contemporaneous record demonstrates that MPG West was confident in its ability to perform at the outset of the contract. Even after performance began, MPG West expressed optimism about its performance. (Finding 73) Moreover, MPG West already was performing on the prior contract for the incumbent for the past six or

32

seven years. MPG West's role in the incumbent contract included training personnel at the store level, truckers, and warehouses. (Finding 9) Given MPG West's prominent role in the previous contract, we cannot conclude that the delay in startup caused it harm beyond the $2 million in compensation the CO already paid.

2. Whether the Requirement for FOB Delivery was a Constructive Change

Appellant contends that DeCA constructively changed the contract when it refused to accept produce for the fixed prices MPG West proposed (app. br. at 44). According to appellant, DeCA relied on pricing metrics that were not included in the contract to request that MPG West lower its prices on certain items or remove those items from the weekly catalog (app. br. at 45).

As we stated in our discussion of the weekly pricing meetings, DeCA possessed discretion under the contract to review produce prices on a weekly basis and to reject items offered at unreasonable prices (findings 91-92, 98, 103-105). We concluded that DeCA did not abuse its discretion in doing so, and that it was appropriate for DeCA to rely on its own metrics to determine whether produce prices were "reasonable." (*See* discussion at ¶ III.B.3, below). These conclusions leave no room for the argument that DeCA's price review was a constructive change of the contract.

Moreover, as the government observes, the FOB contract term is an express term of the contract, and the obligation to comply with it cannot be a constructive change (gov't br. at 40). While it is true that the FOB term was a change from the prior contract, there is no dispute that it was included in the final contract (findings 25, 27). Indeed, the term was the subject of published vendor questions and bid protests challenging its feasibility, so MPG West should have been fully aware of the requirement (finding 5).

3. Whether the Weekly Pricing Meetings Constituted Constructive Change

The weekly price review was one of two pricing mechanisms set forth in the contract. The first pricing mechanism identified 35 items as HVCI to be included in monthly Market Basket Surveys, which were required to meet a "Patron Savings Requirement." (Finding 34) The Patron Savings Requirement established a minimum discount based on a comparison of the price of commissary items to "like" items in comparable retail grocery stores (finding 34). The parties do not dispute that MPG West met the patron savings requirement and agree that the market survey is not an issue in this appeal (gov't br. at 44).

The second pricing mechanism was the weekly review. The contract required that: "[t]he Government will monitor all other prices provided on the weekly price lists for being fair and reasonable considering the market conditions at the time." (Finding 33)

MPG West argues that DeCA consistently pressured MPG West to keep its prices down, thereby preventing it from charging prices sufficient to cover its costs (app. br. at 44-47). In particular, MPG West asserts that DeCA pressured MPG West at weekly meetings to lower prices or remove high-priced items from its catalog, relying on "pricing metrics that are not included anywhere in the contract." (App. br. at 45; tr. 1/100; app. supp. R4, tabs 851-863). According to MPG West, DeCA continually directed it to charge patrons artificially low prices or not sell its produce at all, even when DeCA knew that MPG West already had purchased and shipped the products to its warehouses in Japan and Korea (app. br. at 47). MPG West cites a long list of emails as evidence that DeCA placed constant downward pricing pressure on MPG West, without consideration of MPG West's actual prices (app. br. at 46).

In response, the government contends that it approved the vast majority of the items proffered by appellant on a weekly basis, and that its employees expended "extraordinary effort . . . and cooperation that went beyond what is reasonably expected" in working with MPG West (gov't br. at 52). According to the government, the weekly price reviews "conformed to the express contract terms regarding price monitoring and ordering, and were conducted in a fair manner." (Gov't br. at 44)

We have reviewed the dozens of emails cited by MPG West as evidence of downward pricing pressure and conclude that DeCA conducted its price reviews in a fair and reasonable manner consistent with the express terms of the contract. Bridget Bennett, the DeCA Produce Category Manager and her team developed criteria for gauging the reasonableness of prices. These criteria included trend analysis, suggested retail cost over $5.00 per unit, week-to-week price increases over 20 percent, and the promotional status of an item (finding 103). While it is true that these specific criteria are not set forth in the contract, they are a logical and consistent means of determining the reasonableness of prices on an ongoing basis. By developing and applying a consistent set of criteria, rather than taking an arbitrary and *ad hoc* approach, DeCA acted in a reasonable manner. *See*, *e.g.*, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (sustaining agency action "evincing rational reasoning and consideration of relevant factors").

Moreover, for each specific item it questioned, DeCA identified *why* it was questioning the price and gave MPG West an opportunity to explain the price (findings 103-104). In some situations, MPG West acknowledged and corrected pricing errors or explained that the local growing season was ending (finding 110). In other situations, however, MPG West tersely responded that the price was the "new retail price" or due to a "FOB increase." (Finding 111) Finally, as Ms. Bennett testified, DeCA approved the vast majority of the items submitted by MPG West on a weekly basis (finding 106).

IV. Breach of Duty to Cooperate with Performance

Appellant contends that DeCA breached its duty to cooperate with performance by failing to ensure that government SOFA representatives and veterinarian inspectors adequately were prepared for the new contract model (app. br. at 53-55). According to MPG West, this created prolonged confusion over the import process under the contract (app. br. at 111). MPG West further contends that DeCA failed to inform its commissary personnel about the new contract, particularly that the new contract would result in higher prices for produce due to the elimination of the freight subsidy (app. reply br. at 41).

MPG West cites various financial losses relating to importing produce, including border inspections resulting in condemnation and disposal of unacceptable products; short notice airlifts to replace condemned produce; confusion regarding paperwork to clear customs; and failed sanitary audits for local storage and processing warehouses (app. br. at 127). In particular, MPG West contends that DeCA interfered with the inspection process for imported goods by failing to inform SOFA representatives of the new procedures under the new contract (app. br. at 111).

Every contract imposes upon each party "a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (citations omitted). Pursuant to this implicit duty, each party's obligations "include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id*. at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

However, MPG West cannot rely on the implied duty of good faith and fair dealing to change the terms of its contractual requirements. The Federal Circuit held that a party to a contract cannot use an implied duty of good faith and fair dealing to "expand [another] party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) (citations omitted). Put another way, contractors with the government "cannot rely on the implied covenant of good faith and fair dealing to change the text of their contractual obligations." *Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014).

Turning to this appeal, we must determine the extent to which the implied duty of cooperation requires DeCA to coordinate with other government agencies and assist MPG West with the importation process. *See Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539 (analysis of good faith doctrine should examine "duties that fall within the broad outlines set forth by the express terms of the contract"). Our analysis starts with the contract language concerning importation.

The contract expressly placed all responsibility for import on MPG West. As set forth in the Addendum to FAR 52.212-4, "[t]he contractor(s) shall be fully responsible to supply and import the required produce items if necessary." (Finding 26) Under the contract, MPG West expressly was:

> [R]esponsible for providing all necessary licenses, permits, supervision, facilities, equipment, order processing, distribution, inventory management, and personnel at the contractor's own facilities/distribution center to receive, store, handle, sort, and deliver all required FF&V items to the various commissary locations that are serviced under [the] contract.

(Finding 26)

With respect to compliance with host nation laws, paragraph 27 of the contract stated:

> This is a Requirement Type Contract with a Contractor. As such, the Contractor is not an employee of the U.S. Government and *it is solely the Contractor's responsibility to determine his/her reporting and payment responsibilities under Host Nation tax and labor laws*.

(Finding 39 (emphasis added))

With respect to DeCA's role in the importation process, paragraph 27 of the contract further provided that:

> [The contractor's] [s]tatus as a member of the U.S. Forces under the USFK and/or Japanese SOFA does not in itself relieve the Contractor of responsibilities under Host Nation laws. Contractor should consult appropriate authorities and advisors on these matters. *Department of Defense military and civilian personnel will not provide advice in these matters*. Contractor shall hold harmless the U.S. Government for any liability that may arise from the Contractor's noncompliance with Host Nation laws.

(Finding 39 (emphasis added))

Taken together, these contractual provisions place the sole responsibility for the importation process on MPG West. Crucially, the contract gives MPG West the discretion *whether* to import produce – stating that "[t]he contractor(s) shall be fully responsible to supply and import the required produce items *if necessary*." (Finding 26) (emphasis added) Indeed, as the solicitation stated, DeCA stated from the outset that the contractor would need to "locally source as much FF&V as possible from the local market, which would include locally available imported items" (finding 10).

We are convinced that MPG West's financial losses resulted predominantly from factors within its control, rather than from government conduct. The record demonstrates that MPG West failed to timely implement a local sourcing plan. As a result, MPG West sourced most of its produce from overseas (finding 76). For imported produce, MPG West paid brokerage fees to its sister company, Parma Fruit (also owned by Mr. Penny) (finding 77), and it incurred extra costs of transporting the produce to Korea and Japan (finding 78).

In an effort to avoid paying import duties, and to secure a way to import embargoed items, MPG West elected to import some items under a modified SOFA process (finding 82). However, under the terms of SOFA, items imported in that manner could not be resold locally (finding 83). Finally, MPG West elected not to alter its profit margins on individual items, as is common in the grocery business, instead charging the same profit on each item (finding 90).

With respect to DeCA's failure to coordinate with SOFA representatives, the contract expressly states that it is not subject to SOFA (finding 79). MPG West unilaterally chose to import items under the SOFA agreement (finding 82); therefore DeCA had no duty to coordinate with SOFA representatives, other than to assist when MPG West requested and to avoid hindering MPG West. Moreover, the CO explained at the hearing that DeCA wrote a letter to South Korean customs explaining that MPG West was permitted to import embargoed items for sale in the commissaries, and states that importation difficulties ended after the letter (finding 85).

As discussed above, the weekly pricing review was reasonable and consistent with contract terms (see section II.B.3). We further held that MPG West had sufficient time during the startup period to prepare for performance (see section III.B.1). Finally, the record contains no evidence that the government interfered with MPG West's performance of the contract. *RDA Const. Corp. v. United States*, 132 Fed. Cl. 732 (2017).

V. Defective Specifications in Bagged Salad Requirement/Termination for Convenience

MPG West argues that the bagged salad requirement was defective, because when it supplied bagged salads from Fresh Express at a price that was inclusive of all costs of

transportation, customs clearance, and overhead, the price paid by patrons was greater than what DeCA would accept (app. br. at 76). MPG West further contends that the government admitted that the requirement was defective in the February 2017 IG report (app. br. at 120). MPG West also asserts that DeCA's decision to remove the requirement is an admission that the requirement was flawed and that "a termination for convenience finding makes sense..." (app. br. at 76-77). MPG West claims that it spent $5,089,321.56 more on providing bagged salads than DeCA paid for them (app. br. at 121).

In response, the government contends that it agreed – at MPG West's request – to remove the bagged salad requirement from the contract, because MPG West was unable to make a profit offering bagged salads (gov't br. at 54; finding 118). It further contends that bagged salad requirement was not defective, because bagged salads were not included in the pool of products listed as HCVI that were used to calculate the Patron Savings Requirement (*id.*).

Finally, the government asserts that the contract contained a patent ambiguity requiring appellant to sole source bagged salads from Fresh Express (gov't br. at 56). According to the government, MPG West had a duty to inquire about the ambiguity and, because it did not, its interpretation of the contract should be precluded from consideration (gov't br. at 57). *See Travelers Cas. and Sur. of America v. United States*, 74 Fed. Cl. 75, 88 (2006) (quoting *Beacon Constr. Co. of Mass v. United States*, 314 F.2d 501, 504 (Ct. Cl. 1963)) (patent ambiguity is "an obvious omission, inconsistency, or discrepancy of significance").

A defective specification is a breach of the government's implied warranty that satisfactory contract performance will result from adherence to the specification. *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1289 (Fed. Cir. 2000). To recover on this basis, MPG West must show that there was a defect, that it reasonably relied on the defect, and that the defect was latent. *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004); *Robins Maint., Inc. v. United States*, 265 F.3d 1254, 1257 (Fed. Cir. 2001). Specifically, the government's issuance of a misleading solicitation itself can be the basis for a price adjustment under a defective specification claim. *BECO Constr. Co., Inc.*, ASBCA No. 57483, 11-2 BCA ¶ 34,817 at 171,338; *F.J. Stokes Corp.*, ASBCA No. 6532, 1963 BCA ¶ 3944 at 19,542.

MPG West has not identified any specific aspect of the bagged salad requirement that was defective. Rather, MPG West's contention boils down to its assertion that it was unable to perform the requirement without losing money. This contention – even if true – is not sufficient to demonstrate that the requirement was defective. *See United States v. Spearin*, 248 U.S. 132, 136 (1918) ("Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.").

As we discussed above in Section II.B., we do not find the IG report dispositive as an admission that the bagged salad requirement was flawed. The Guam report analyzed data from Guam and did not address matters relating to Korea or Japan (finding 122). Accordingly, its findings cannot be construed as an admission concerning the delivery of bagged salads in Korea or Japan (finding 125).

Moreover, MPG West has failed to demonstrate that it relied on the allegedly defective requirement, because when it became apparent that it could not profitably perform, the government agreed to modify the contract to remove the bagged salad requirement (finding 118). This decision cannot be construed as an admission that the requirement was defective. This was done bilaterally under the Changes clause of the contract, not under the Termination clause (finding 119). Accordingly, MPG West cannot avail itself of the termination clause and its arguments to the contrary must fail.

Finally, to the extent that MPG West contends that the bagged salad requirement was flawed because it was restricted to using Fresh Express as its sole source, MPG West cannot reasonably contend that it was misled by this requirement. Indeed, the contract included Fresh Express as the source of bagged salads because MPG West identified Fresh Express as its supplier (finding 112). *See Comtrol, Inc. v. United States*, 294 F.3d 1357, 1364 (Fed. Cir. 2002) (citing *Robins Maint.*, 265 F.3d at 1257) (no recovery unless contractor actually was misled by erroneous statements in the specifications).

VI. Whether to take Judicial Notice COFC Bid Protest Proceedings

MPG West asks us to take judicial notice of certain factual findings that were litigated in the bid protest litigation in the United States Court of Federal Claims (COFC) (app. br. at 58). According to MPG West, DeCA now takes positions on these issues that are contrary to the positions it took in the bid protest litigation. MPG West does not insist that DeCA be estopped from taking contrary positions. Rather it "simply asks that this Board take notice of the facts and issues raised in previous litigation over this same contract, and not permit the Government to prevail on arguments that are plainly contradicted to what has gone before." (App. br. at 65) DeCA offers no response to this argument, other than to defend its positions in this appeal on the merits.

Appellant would have us infer conclusions from these uncontested facts. For example, appellant asks the Board to preclude the government from contending that additional costs incurred by appellant under the contract were the result of poor management (app. br. at 59). However, the COFC's factual holdings do not support this inference. DeCA's pre-award evaluation of MPG's business references and past performance has no bearing on its actual contract performance. Moreover, appellant admits that COFC held that DeCA's market research was adequate and complied with

39

FAR 10.001(a)(3)(1) (app. br. at 34). Therefore, we decline to give preclusive effect to the positions DeCA took in the COFC bid protest litigation.

## CONCLUSION

We conclude that MPG West has failed to carry its burden of proving either that the government breached the terms of the contract, or that the government constructively changed the contract. Because we conclude that MPG West is not entitled to recovery, we do not reach the issue of quantum. Accordingly, the appeals are denied.

Dated: November 9, 2020

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61100, 61560, 61570, Appeals of MPG West, LLC, rendered in conformance with the Board's Charter.

Dated: November 9, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals